GARY O'BRIEN, PLAINTIFF-RESPONDENT, v. MUSKIN CORPO-
RATION, FORMERLY KNOWN AS HPE, INC., DEFENDANT-
APPELLANT, AND KIDDIE CITY, LIONELL LEISURE, INC., A
SUBSIDIARY OF LIONELL CORPORATION AND KIDDIE
CITY INC., T/A KIDDIE CITY, DEFENDANTS AND THIRD
PARTY PLAINTIFFS-APPELLANTS, v. THE ESTATE OF AR-
THUR HENRY AND JEAN LORRAINE HENRY (GLASS),
THIRD PARTY DEFENDANTS-RESPONDENTS.

Argued November 9, 1982—Decided August 2, 1983.

*John A. Fratto* argued the cause for appellant Muskin Corporation, etc. (*Fratto, Little, Allessi & Abbott,* attorneys; *Frederick F. Fitchett, III,* on the brief).

*Burchard V. Martin,* on behalf of appellant Kiddie City, et al., relied upon the brief and argument of appellant Muskin Corporation, etc. (*Martin, Crawshaw & Mayfield,* attorneys).

*Thomas F. Connery, Jr.,* argued the cause for respondent Gary O'Brien (*Brown, Connery, Kulp, Wille, Purnell & Greene,* attorneys).

*William L. Lundgren, III,* submitted a letter in lieu of brief on behalf of respondents The Estate of Arthur Henry, et al (*Green & Lundgren,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

■ Plaintiff, Gary O'Brien, seeks to recover in strict liability for personal injuries sustained because defendant, Muskin Corporation, allegedly marketed a product, an above-ground swimming pool, that was defectively designed and bore an inadequate warning. In an unreported decision, the Appellate Division

reversed the judgment for defendants and remanded the matter for trial. We granted certification, 91 *N.J.* 548 (1982), and now modify and affirm the judgment of the Appellate Division. In reaching that result, we conclude that state-of-the-art evidence is relevant to risk-utility analysis and admissible in a strict liability case involving a defectively designed product.

O'Brien sued to recover damages for serious personal injuries sustained when he dove into a swimming pool at the home of Jean Henry, widow of Arthur Henry, now Jean Glass. Ultimately, plaintiff sued as defendants not only Muskin Corporation, the manufacturer, but also Kiddie City Inc., the distributor of the pool, charging them with placing a defectively designed pool in the stream of commerce. Kiddie City filed a third-party complaint for contribution against the owners of the pool. Defendants filed cross-claims for contribution and indemnification against each other, and Muskin filed a cross-claim against the owners.

At the beginning of the jury trial, the claims against Kiddie City were dismissed with the consent of the parties. At the close of the plaintiff's case, the trial court determined that he had failed to prove a design defect in the pool. Accordingly, at the close of the entire case, the court refused to charge the jury on design defect. Instead, the court submitted the case to the jury solely on the adequacy of the warning.

In response to special interrogatories, the jury found that Muskin had "manufactured a product that was not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes or use," that the defect existed when the product left Muskin's control, and that the defect was a cause of O'Brien's injury. The jury found further that O'Brien was a trespasser, rather than a social guest, at the time of the accident, thus exculpating the Henrys. Finally, the jury found that O'Brien was guilty of contributory negligence, and allocated fault for the injury as 15% attributable to Muskin and 85% attributable to O'Brien. Thus, under New Jersey's comparative negligence

statute, O'Brien was barred from recovery. *See N.J.S.A.* 2A:15–5.1. The trial occurred before our decision in *Roman v. Mitchell,* 82 *N.J.* 336 (1980), and the court did not give an "ultimate outcome" instruction; that is, the court failed to instruct the jury on the effect on plaintiff's recovery of its allocation of fault.

On appeal, the Appellate Division found that the trial court erred in removing from the jury the issue of design defect. Consequently, that court reversed the judgment against Muskin and remanded the matter for a new trial. The Appellate Division also determined that plaintiff was a trespasser at the time of the accident and resolved that the issue of his status need not be relitigated at a new trial. Furthermore, the court below vacated the consent judgment dismissing the complaint and cross-claim against Kiddie City. Finally, the Appellate Division ruled that at the re-trial the trial court should include a charge on the effect of the allocation of fault between plaintiff and defendant. *See Roman v. Mitchell,* 82 *N.J.* 336 (1980).

We agree that the status of the plaintiff need not be relitigated, but disagree with vacating the dismissal against Kiddie City. For the reasons set forth in this opinion, we affirm the remand of the matter for a new trial.

I

Muskin, a swimming pool manufacturer, made and distributed a line of above-ground pools. Typically, the pools consisted of a corrugated metal wall, which the purchaser placed into an oval frame assembled over a shallow bed of sand. This outer structure was then fitted with an embossed vinyl liner and filled with water.

In 1971, Arthur Henry bought a Muskin pool and assembled it in his backyard. The pool was a twenty-foot by twenty-four-foot model, with four-foot walls. An embossed vinyl liner fit within the outer structure and was filled with water to a depth of approximately three and one-half feet. At one point, the

outer wall of the pool bore the logo of the manufacturer, and below it a decal that warned "DO NOT DIVE" in letters roughly one-half inch high.

On May 17, 1974, O'Brien, then twenty-three years old, arrived uninvited at the Henry home and dove into the pool. A fact issue exists whether O'Brien dove from the platform by the pool or from the roof of the adjacent eight-foot high garage. As his outstretched hands hit the vinyl-lined pool bottom, they slid apart, and O'Brien struck his head on the bottom of the pool, thereby sustaining his injuries.

In his complaint, O'Brien alleged that Muskin was strictly liable for his injuries because it had manufactured and marketed a defectively designed pool. In support of this contention, O'Brien cited the slippery quality of the pool liner and the lack of adequate warnings.

At trial, both parties produced experts who testified about the use of vinyl as a pool liner. One of the plaintiff's witnesses, an expert in the characteristics of vinyl, testified that wet vinyl was more than twice as slippery as rubber latex, which is used to line in-ground pools. The trial court, however, sustained an objection to the expert's opinion about alternative kinds of pool bottoms, specifically whether rubber latex was a feasible liner for above-ground pools. The expert admitted that he knew of no above-ground pool lined with a material other than vinyl, but plaintiff contended that vinyl should not be used in above-ground pools, even though no alternative material was available. A second expert testified that the slippery vinyl bottom and lack of adequate warnings rendered the pool unfit and unsafe for its foreseeable uses.

Muskin's expert testified that vinyl was not only an appropriate material to line an above-ground pool, but was the best material because it permitted the outstretched arms of the diver to glide when they hit the liner, thereby preventing the diver's head from striking the bottom of the pool. Thus, he concluded that in some situations, specifically those in which a diver

executes a shallow dive, slipperiness operates as a safety feature. Another witness, Muskin's customer service manager, who was indirectly in charge of quality control, testified that the vinyl bottom could have been thicker and the embossing deeper. A fair inference could be drawn that deeper embossing would have rendered the pool bottom less slippery.

At the close of the entire case, the trial court instructed the jury on the elements of strict liability, both with respect to design defects and the failure to warn adequately. The court, however, then limited the jury's consideration to the adequacy of the warning. That is, the court took from the jury the issue whether manufacturing a pool with a vinyl liner constituted either a design or manufacturing defect.

## II

Strict liability law, a relatively recent but rapidly growing legal phenomenon, has received uneven treatment from scholars, legislatures and courts. Underlying the various responses is a shared concern about the allocation of the risk of loss upon manufacturers, distributors and others in the stream of commerce for injuries sustained by the public from unsafe products.

One of the policy considerations supporting the imposition of strict liability is easing the burden of proof for a plaintiff injured by a defective product, a policy that is achieved by eliminating the requirement that the plaintiff prove the manufacturer's negligence. Keeton, "Product Liability and the Meaning of Defect," 5 *St. Mary's L.J.* 30, 34–35 (1973). Generally speaking, a plaintiff has the burden of proving that (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; and (3) the defect caused injury to a reasonably foreseeable user. *Michalko v. Cooke Color & Chemical Corp.,* 91 *N.J.* 386, 394 (1982). Proof that the product was defective requires more than a mere showing that the product caused the injury. The necessity of proving a defect in the product as part of the plaintiff's *prima facie* case distin-

guishes strict from absolute liability, and thus prevents the manufacturer from also becoming the insurer of a product. *See Caterpillar Tractor Co. v. Beck*, 593 *P*.2d 871, 877 (Alaska 1979); Birnbaum, "Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence," 33 *Vand.L.Rev.* 593, 600 n. 32 (1980).

 Fundamental to the determination of a products liability case, including one predicated on a defective design or inadequate warning, is the duty of the manufacturer to foreseeable users. The duty includes warning foreseeable users of the risks inherent in the use of that product, *see Michalko*, 91 *N.J.* at 403, and not placing defective products on the market. *Cepeda v. Cumberland Engineering Co., Inc.*, 76 *N.J.* 152, 163 (1978); *see Restatement (Second) of Torts* § 402A (1965). A manufacturer who breaches these duties is strictly liable to an injured party. That liability reflects the policy judgment that by marketing its product, a manufacturer assumes responsibility to members of the public who are injured because of defects in that product. *Restatement (Second) of Torts* § 402A comment c (1965).

 In determining whether a manufacturer has breached its duty, we focus on the product. *Michalko*, 91 *N.J.* at 394; *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229, 238 (1981); *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 169 (1979); *see* Wade, "On Product Design Defects and Their Actionability," 33 *Vand.L.Rev.* 551, 553 (1980). Under strict liability, a manufacturer that produces defective products is liable even if those products are carefully produced. Thus, the legal standard for evaluating whether a product is defective becomes the touchstone of strict liability.

 Critical, then, to the disposition of products liability claims is the meaning of "defect". The term is not self-defining and has no accepted meaning suitable for all strict liability cases. Implicit in the term "defect" is a comparison of the product with a standard of evaluation; something can be defective only if it fails to measure up to that standard. Birnbaum,

*supra,* at 603. Speaking generally, defects may be classified as design defects or manufacturing defects. In cases alleging manufacturing defects, as distinguished from design defects, defining the standard, and thus the meaning of "defect," is relatively easy. For example, the injury-causing product may be measured against the same product as manufactured according to the manufacturer's standards. If the particular product used by the plaintiff fails to conform to those standards or other units of the same kind, it is defective. An apt illustration is a mass-produced product that comes off the assembly line missing a part. The question in those cases becomes whether the product as produced by the manufacturer conformed to the product as intended. *See Cepeda,* 76 *N.J.* at 169.

The considerations are more subtle when a plaintiff alleges that a product is defective due to any feature of its design, including the absence or inadequacy of accompanying warnings. In design defect or failure-to-warn cases, the product has been manufactured as intended and cannot be "defective" by comparison to a standard set by the manufacturer. *See Suter,* 81 *N.J.* at 170. Rather, the standard to measure the product reflects a policy judgment that some products are so dangerous that they create a risk of harm outweighing their usefulness. From that perspective, the term "defect" is a conclusion rather than a test for reaching that conclusion. Wade, *supra,* 33 *Vand.L.Rev.* at 552.

Although the appropriate standard might be variously defined, one definition, based on a comparison of the utility of the product with the risk of injury that it poses to the public, has gained prominence. To the extent that "risk-utility analysis," as it is known, implicates the reasonableness of the manufacturer's conduct, strict liability law continues to manifest that part of its heritage attributable to the law of negligence. *See Suter,* 81 *N.J.* at 171; *see generally* Birnbaum, *supra,* at 609–10. Risk-utility analysis is appropriate when the product may function satisfactorily under one set of circumstances, yet because of

its design present undue risk of injury to the user in another situation.

Another standard is the consumer expectations test, which recognizes that the failure of the product to perform safely may be viewed as a violation of the reasonable expectations of the consumer. *Suter,* 81 *N.J.* at 170–71. In this case, however, the pool fulfilled its function as a place to swim. The alleged defect manifested itself when the pool was used for diving.

▮ As stated in *Cepeda,* some factors relevant in risk-utility analysis are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. [76 *N.J.* at 174].

▮ By implication, risk-utility analysis includes other factors such as the "state-of-the-art" at the time of the manufacture of the product. *See Cepeda,* 76 *N.J.* 174. The "state-of-the-art" refers to the existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed. Robb, "A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases," 77 *Nw.U.L.Rev.* 1, 4–5 & n. 15 (1977). Although customs of an industry may be relevant, *Suter,* 81 *N.J.* at 171–72, because those customs may lag behind technological development, they are not identical with the state-of-the-art. *See Michalko,* 91 *N.J.* at 397–98; Robb, *supra,* 77 *Nw.U.L.Rev.* at 4–5. A manu-

facturer may have a duty to make products pursuant to a safer design even if the custom of the industry is not to use that alternative. *Michalko,* 91 *N.J.* at 397.

 State-of-the-art relates to both components of the risk-utility equation, *Suter,* 81 *N.J.* at 171–72. Although the focus is on the product, our attention is drawn to the reasonableness of the manufacturer's conduct in placing the product on the market. *Id.* In that regard, the risk side of the equation may involve, among other factors, risks that the manufacturer knew or should have known would be posed by the product, as well as the adequacy of any warnings. The utility side generally will include an appraisal of the need for the product and available design alternatives. Furthermore, some products are unavoidably unsafe: the need for a product may be great, but the existing state of human knowledge may not make it safe. *Restatement* § 402A, comment k. With those products, the determination of liability may be achieved more appropriately through an evaluation of the adequacy of the warnings. In brief, risk-utility analysis is not a petrified, but a dynamic process. Where a particular product falls on the risk-utility continuum will depend on the facts of each case. A toy that poses undue risks to infants may be viewed differently from a therapeutic device that protects or prolongs life. As we proceed, as we must, on a case-by-case basis, risk-utility analysis provides the flexibility necessary for an appropriate adjustment of the interests of manufacturers, consumers, and the public.

 Although state-of-the-art evidence may be dispositive on the facts of a particular case, it does not constitute an absolute defense apart from risk-utility analysis. *See Beshada v. Johns-Manville Products Corp.,* 90 *N.J.* 191, 202–05 & n. 6 (1982). The ultimate burden of proving a defect is on the plaintiff, but the burden is on the defendant to prove that compliance with state-of-the-art, in conjunction with other relevant evidence, justifies placing a product on the market. Compliance with proof of state-of-the-art need not, as a matter of law, compel a

judgment for a defendant. State-of-the-art evidence, together with other evidence relevant to risk-utility analysis, however, may support a judgment for a defendant. In brief, state-of-the-art evidence is relevant to, but not necessarily dispositive of, risk-utility analysis. That is, a product may embody the state-of-the-art and still fail to satisfy the risk-utility equation.

The assessment of the utility of a design involves the consideration of available alternatives. If no alternatives are available, recourse to a unique design is more defensible. The existence of a safer and equally efficacious design, however, diminishes the justification for using a challenged design.

The evaluation of the utility of a product also involves the relative need for that product; some products are essentials, while others are luxuries. A product that fills a critical need and can be designed in only one way should be viewed differently from a luxury item. Still other products, including some for which no alternative exists, are so dangerous and of such little use that under the risk-utility analysis, a manufacturer would bear the cost of liability of harm to others. That cost might dissuade a manufacturer from placing the product on the market, even if the product has been made as safely as possible. Indeed, plaintiff contends that above-ground pools with vinyl liners are such products and that manufacturers who market those pools should bear the cost of injuries they cause to foreseeable users.

A critical issue at trial was whether the design of the pool, calling for a vinyl bottom in a pool four feet deep, was defective. The trial court should have permitted the jury to consider whether, because of the dimensions of the pool and slipperiness of the bottom, the risks of injury so outweighed the utility of the product as to constitute a defect. In removing that issue from consideration by the jury, the trial court erred. To establish sufficient proof to compel submission of the issue to the jury for appropriate fact-finding under risk-utility analysis, it was not necessary for plaintiff to prove the existence of

alternative, safer designs. Viewing the evidence in the light most favorable to plaintiff, even if there are no alternative methods of making bottoms for above-ground pools, the jury might have found that the risk posed by the pool outweighed its utility.

In a design-defect case, the plaintiff bears the burden of both going forward with the evidence and of persuasion that the product contained a defect. To establish a *prima facie* case, the plaintiff should adduce sufficient evidence on the risk-utility factors to establish a defect. With respect to above-ground swimming pools, for example, the plaintiff might seek to establish that pools are marketed primarily for recreational, not therapeutic purposes; that because of their design, including their configuration, inadequate warnings, and the use of vinyl liners, injury is likely; that, without impairing the usefulness of the pool or pricing it out of the market, warnings against diving could be made more prominent and a liner less dangerous. It may not be necessary for the plaintiff to introduce evidence on all those alternatives. Conversely, the plaintiff may wish to offer proof on other matters relevant to the risk-utility analysis. It is not a foregone conclusion that plaintiff ultimately will prevail on a risk-utility analysis, but he should have an opportunity to prove his case.

In considering a motion to dismiss, the trial court should decide whether, viewing the evidence in the light most favorable to the plaintiff, *Dolson v. Anastasia,* 55 *N.J.* 2, 5 (1969), the jury might conclude that the plaintiff had proved the existence of a defect. If not, the court could grant the motion as a matter of law. *R.* 4:37–2(b). Otherwise, the resolution of those facts under an appropriate charge based on the risk-utility analysis is for the trier of fact. *Cf. Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229 (1981); *see Birnbaum, supra,* at 638–39.

Our concurring and dissenting colleague, Justice Schreiber, disagrees with the majority opinion in several respects. His opinion begins with the correct statement that the

imposition of strict liability in a products liability case requires proof of a defect in the product. We depart from our colleague, however, because he believes that proof of a defect through risk-utility analysis is tantamount to absolute, not strict, liability. The majority opinion concludes that risk-utility analysis is one means of proving the existence of a defect. That is, under risk-utility analysis, if the risks outweigh the utility of the product, it is defective.

A second difference between the two opinions is that Justice Schreiber would find that no matter how dangerous a product may be, if it bears an adequate warning, it is free from design defects if there is no known alternative. Under that hypothesis, manufacturers, merely by placing warnings on their products, could insulate themselves from liability regardless of the number of people those products maim or kill. By contrast, the majority concludes that the judicial, not the commercial, system is the appropriate forum for determining whether a product is defective with the resultant imposition of strict liability upon those in the commercial chain.

Still another difference between the opinions is that the majority finds a proper place for both the court and jury in risk-utility analysis. *See* J. Wade, "On the Nature of Strict Liability for Products," 44 *Miss.L.J.* 825, 838–41 (1973). If the minds of reasonable men could not differ on whether the risks posed by a product outweigh its utility, or vice versa, then the court could make the appropriate determination as a matter of law. Thus, as Professor Wade states, "[i]f a plaintiff sues the manufacturer of a butcher knife because he cut his finger, on the sole ground that the knife was so sharp that it was likely to cut human flesh, the court would probably take the case out of the hands of the jury and not give it an opportunity to find that the knife was unsafe." If, however, there is a fact question whether the risks outweigh the utility of the product, then the matter is for the trier of fact. Contrary to Justice Schreiber's assertion, Professor Wade not only recognizes that some cases

should be submitted to the jury, but actually proffers a suggested charge and sets forth other charges as examples. Wade, *supra,* at 839–40. Our colleague, however, would never permit the jury to resolve those fact issues.

With the deepest respect for Justice Schreiber, who was the author of the majority opinion in *Suter v. San Angelo Foundry & Machine Company,* we believe that our reading is closer to the language of *Suter:* "Although the considerations for the jury are somewhat comparable to those of the trial court, their decisional functions differ. The court decides what protection should be given and the jury is concerned with reaching a just result as between the parties." 81 *N.J.* 150, 173 (1979).

This approach, reflecting the current understanding of the trial bench, is expressed in different forms in the *Model Jury Charges, Products Liability,* No. 5.27, May 1980, provided to all state court trial judges, and in W. Dreier and H. Goldmann, *Products Liability Law in New Jersey:* A Practitioner's Guide (N.J. Inst. for Continuing Legal Educ. 1982), distributed to those judges at the 1982 Judicial College. Justice Clifford, in his concurring opinion, quotes the two publications and discusses apparent differences between them. *Post* at 191. The fact remains, however, that both publications find proper places for the judge and jury in determining the existence of a design defect through risk-utility analysis.

Finally, we disagree with that part of Justice Schreiber's opinion that purports to transplant into strict liability for defective products, the subject of analysis in section 402A of the *Restatement (Second) of Torts,* the principles pertaining to the strict liability for damages caused by abnormally dangerous activities. *Restatement (Second) of Torts* §§ 519–20.

In concluding, we find that, although the jury allocated fault between the parties, the allocation was based upon the consideration of the fault of Muskin without reference to the design defect. Perhaps the jury would have made a different alloca-

tion if, in addition to the inadequacy of the warning, it had considered also the alleged defect in the design of the pool.

All parties consented at trial to a dismissal of all claims against Kiddie City, on the assumption that it did not manufacture the vinyl liner and that it was merely a conduit between the manufacturer and the purchaser. That assumption was based on Muskin's acknowledgment throughout the pre-trial proceedings that it made the vinyl liner. In the course of the trial, the purchaser testified that all parts of the pool, including the liner, arrived in Muskin boxes, but a Muskin witness testified, to everyone's surprise, that the liner was not a Muskin product. To avoid possible prejudice to Muskin and plaintiff, the Appellate Division vacated the dismissal of the claims as to Kiddie City. We believe the appropriate disposition is to reinstate the dismissal as to Kiddie City and to preclude Muskin from denying that it made the vinyl liner.

We modify and affirm the judgment of the Appellate Division reversing and remanding the matter for a new trial.

CLIFFORD, J., concurring in result.

But for one paragraph in the majority opinion, *ante* at 181–182, which unfortunately—and unnecessarily in this case—breathes life into the cadaver of the "consumer expectations" test for a design defect, I join in the Court's disposition of this appeal. I continue to adhere to my views on that subject as set forth with "vox clamantis in deserto" (Mark 1:3) in *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 178, 190 (1979) (concurring opinion), to this effect: using consumer expectations as a gauge for determining defect limits liability to those situations in which the *consumer* deems the product unsafe. This is contrary to a fundamental basis of strict liability because the consumer simply does not have adequate information to know what to expect. See *Escola v. Coca-Cola Bottling Co.*, 24 *Cal.*2d 453, 466, 150 *P.*2d 436, 443 (1944) (Traynor, J., concurring).

Were that trifling gaffe my sole concern, I probably would not be moved to write. More troublesome however, is Justice

Schreiber's reading of the majority opinion, particularly his assertion that today's decision takes *Beshada v. Johns-Manville Prod. Corp.*, 90 *N.J.* 191 (1982), a step farther along an intolerably extreme path. I share Justice Schreiber's thinly-disguised discomfort with *Beshada;* and if I believed for one moment that our decision today advanced *Beshada's* exotic theory, I would jump ship. It does not, so I do not.

State-of-the-art evidence is implicitly included in the factors employed in the risk/utility analysis adopted in *Cepeda v. Cumberland Eng'g Co., Inc.*, 76 *N.J.* 152, 172–75 (1978), whose use is reaffirmed today, *ante* at 181–183.[1] Whereas *Beshada* foreclosed the use of state-of-the-art as a defense to a design-defect-warning case, today's majority opinion could scarcely be more unambiguous in pointing out that state-of-the-art evidence is just one type of proof that may be relevant on the central issue of defect and that it may, in certain instances, support a judgment for defendant. *Ante* at 183.

That leads indirectly to a lingering concern on a different aspect of the case, and that is the respective function of judge and jury in the handling of the risk/utility analysis. Would that I could persuade my colleagues to return to Judge Conford's lucid treatment of the subject in *Cepeda*, as follows:

> Dean Wade suggests that before determining whether the case for liability should be given to the jury the trial court should give consideration to whether a balanced consideration of the following factors did not preclude liability as a matter of law:
>
> [Thereupon, the seven risk/utility factors.]
>
> If the case is sent to the jury, since it would not always be appropriate for the court to include in the instructions to the jury all seven of the factors mentioned above, Dean Wade suggests the following model instruction:
>
> "A [product] is not duly safe if it is so likely to be harmful to persons [or property] that a reasonable prudent manufacturer [supplier], who had actual

---

[1]The third and fourth factors embody state-of-the-art considerations:

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

knowledge of its harmful character would not place it on the market. It is not necessary to find that this defendant had knowledge of the harmful character of the [product] in order to determine that it was not duly safe."

Subject to substituting the Section 402A language, "defective condition unreasonably dangerous," for the Wade-preferred "not duly safe," we approve and adopt this instruction for incorporation into a charge in an action against a manufacturer for strict liability in tort based upon the design defect of a product. Such a charge would be usefully amplified by the judge calling to the attention of the jury for their consideration any of the Wade factors mentioned above going into the risk/utility analysis for which there is specific proof in the case and especial significance * * *. [76 *N.J.* at 173–75 (citation and footnote omitted).]

Despite that recommended charge's many virtues—not the least of which, by any means, are its crisp simplicity and clarity—it was rejected in *Suter, supra*, 81 *N.J.* at 177; see 81 *N.J.* at 183–84 (concurring opinion). I hasten to give reassurance that I do not here propose to take up the cudgels once again in behalf of the "defective condition unreasonably dangerous" language of *Restatement (Second) of Torts* § 402A (1965), having long since despaired of nudging this Court in the direction of the "modern, enlightened trend of the law on this subject * * *." *Freund v. Cellofilm*, 87 *N.J.* 229, 248–51 (1981) (concurring opinion). Rather I suggest we should salvage what we can from the unsettled state of our law in the area of how risk/utility should be treated by judge and jury, to the end that trial judges will know what they should decide as matters of law and what they should give to the jury in design-defect-strict-liability cases.

The Model Jury Charge discusses the matter as follows:

Where the claimed design defect is not "self-evident," the trial judge may frequently become engaged in a two-step process:

1. Depending upon the facts of the case, the trial judge may be required to make an initial determination as to whether or not *as a matter of law* liability should be imposed upon the seller-manufacturer for violation of a duty to the injured consumer. [*Suter*] [81 *N.J.*] at 172, 177. In making this evaluation the judge should apply the appropriate "risk-utility" factors set forth in *Cepeda v. Cumberland Engineering Company, Inc.*, 76 *N.J.* at 173–174.

2. Once the trial judge determines that the case should be submitted to a jury, the appropriate "risk-utility" factors should be given to the jury. *Suter*, 81 *N.J.* at 171–72; *Cepeda*, 76 *N.J.* at 173–74. [*Model Jury Charges, Products Liability*, No. 5.27, May 1980.]

On the other hand the materials distributed to every state-court judge at the last annual session of the New Jersey Judicial College approach the problem this way:

i Role of the Court (Risk/Utility Analysis)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

[The] risk/utility factors are not, standing alone, matters of proof or defense. These are the factors for the trial court to consider in determining whether the plaintiff has met its burden of proof in presenting a *prima facie* case, to wit, that a manufacturer, *deemed to know the harmful propensities of its product,* violated its duty not to place a defective product into the stream of commerce. As a practical matter, it is to be reasonably anticipated that one or more of the factors would be raised by either side in the course of either proving or defending against the claim.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

ii Role of Jury

Depending upon the proofs, some factors which may be considered by the jury in deciding the reasonableness of the manufacturer's conduct include (1) the technological feasibility of manufacturing a product whose design would have prevented or avoided the accident, given the known state of the art; and (2) the likelihood that the product will cause injury and the probable seriousness of the injury. See *Cepeda, supra,* 76 *N.J.* at 174. *Suter,* at 171–72.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Although the considerations for the jury are somewhat comparable to those of the trial court, their decisional functions differ. The court decides what protection should be given and the jury is concerned with reaching a just result as between the parties. *Suter* at 173.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Note that the jury is not making a risk/utility analysis. It is considering two, or possibly three of the several factors quoted in *Cepeda* and incorporated by reference in *Suter's* explanation of the Court's role.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

[W. Dreier and H. Goldmann, *Products Liability Law in New Jersey:* A Practitioner's Guide (N.J. Inst. for Continuing Legal Educ. 1982).]

Although neither the Model Jury Charge nor the Practitioner's Guide is considered binding authority, our trial judges of course consult them. Their respective positions may not be irreconcilable but neither do they fit neatly together. Particularly, one must wonder what it is that the Practitioner's Guide would have the jury do with the risk/utility factors if *not* make

a risk/utility analysis to determine whether the product suffers from a design defect. I would lay the confusion created by the Practitioner's Guide comment directly at *Suter's* doorstep. (In fairness to the authors, they disclaim adoption of the position in the Practitioner's Guide as their own.)

My own preference would be to return to the *Cepeda* charge, set forth earlier in this opinion. If the Court wishes to substitute something *Suter*-like for "defective condition unreasonably dangerous"—and I acknowledge that that appears to be the Court's wish—then that transposition could be managed easily. My instinct is that with such a charge, we would make life easier for judges and jurors and bring some needed stability to our products liability law. The Court does not today undertake to spell out a recommended charge, but I do not disagree with its treatment of risk/utility as far as it goes. I therefore join in the majority opinion with the single reservation expressed at the beginning of my concurrence.

SCHREIBER, J., concurring and dissenting.

Until today, the existence of a defect was an essential element in strict product liability. This no longer is so. Indeed, the majority has transformed strict product liability into absolute liability and delegated the function of making that determination to a jury. I must dissent from that conclusion because the jury will not be cognizant of all the elements that should be considered in formulating a policy supporting absolute liability, because it is not satisfactory to have a jury make a value judgment with respect to a type or class of product, and because its judgment will not have precedential effect.

Our Court adopted the principle in the *Restatement (Second) of Torts* § 402A (1965) that the seller of a product in a "defective condition unreasonably dangerous" (we have substituted the language not reasonably safe) is subject to liability for harm to the ultimate user or consumer. *See Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 176 (1979); *Cepeda v. Cumberland Eng'g Co.,* 76 *N.J.* 152, 168–69 (1978). A plaintiff had to prove

that the chattel that caused his injury was *defective*. There had to be something wrong with it. As Dean Wade reminds us, the word "defective" was added to the *Restatement* language "to ensure that it was understood that something had to be wrong with the product." Wade, "On the Nature of Strict Tort Liability for Products," 44 *Miss.L.J.* 825, 830 (1973).

What is a defect? Defects fall within three categories. A flaw in the particular product, such as an improper weld, is one class. A second group consists of design defects. Here there must be a showing that there was an alternative, technologically feasible design available at the time the product was designed. *See Suter,* 81 *N.J.* at 171–72; Wade, "On Product 'Design Defects' and Their Actionability," 33 *Vand.L.Rev.* 551, 573 (1980). The third class, which is closely analogous to the second, involves inadequate warnings and instructions. In a technical sense this does not involve a defect in the product. However, in the absence of reasonable warnings of the dangers of the product and instructions on its use to avoid dangerous consequences, the product is not reasonably safe. The failure to include adequate literature is functionally equivalent to a failure to design properly in that an alternative adequate warning could have been given.

In design defect and inadequate warning cases the product is produced as intended by the manufacturer, but is wanting in another respect. Further, both have some incidents of negligent conduct. In both, the question is whether a manufacturer, assuming his knowledge of the dangerous propensity of the product, acted as a reasonably prudent person in designing the product as he did in light of existing alternatives or in giving the warning that he did.

In addition to establishing that the product was defective because of the flaw, design, or inadequate warning, the plaintiff has the burden of proving that the product with its defect was not reasonably safe, fit and proper. One way this burden can be met is by proving a failure to measure up to consumer expectations.

In deciding whether a case should be submitted to the jury, a court must engage in a risk-utility analysis. The purpose of this analysis is to enable the court to determine whether the issues (existence of a defect, reasonable safety, and causation) should be submitted to the jury or whether as a matter of law, even though a defect exists, the cause for strict product liability *should be dismissed* because of public policy. Note in Justice Clifford's concurring opinion that he quotes approvingly from Judge Conford's "lucid treatment of the subject in *Cepeda*." *Ante* at 189. Judge Conford observed that risk-utility analysis is to be utilized by the court to determine whether liability is to be *precluded* as a matter of law. Judge Conford did not say the court should or could also decide that there was liability as a matter of law.

My research has disclosed no case where liability was imposed, utilizing the risk-utility analysis, as a matter of law for an accident ascribable to a product in the absence of a defect (manufacturing flaw, available alternative, or inadequate warning) other than in the absolute liability context. This Court has sometimes held as a matter of public policy that the cause should *not* be submitted to the jury because the utility of the product outweighed the risks. Illustrative situations are cases such as *Brody v. Overlook Hospital,* 66 *N.J.* 448 (1975) (holding, as a matter of policy, hospital not liable for blood used in transfusion that was infected with hepatitis); *Baptista v. St. Barnabas Medical Center,* 109 *N.J.Super.* 217 (App.Div.) (refusing to hold hospital accountable on the basis of implied warranty or strict liability in tort for injuries resulting from transfusion of incompatible blood), aff'd o.b., 57 *N.J.* 167 (1970); and *Magrine v. Krasnica,* 94 *N.J.Super.* 228 (Hudson County Ct.1967), aff'd *sub. nom. Magrine v. Spector,* 100 *N.J.Super.* 223 (App.Div.1968) (refusing to hold dentist strictly liable for harm caused by defective hypodermic needle), aff'd on both opinions below, 53 *N.J.* 259 (1969). *Cf. Newmark v. Gimbel's Inc.,* 54 *N.J.* 585, 596–97 (1969) (distinguishing *Magrine* and holding that

beauty parlor may be strictly liable for injuries caused by defective permanent wave solution). Risk-utility factors to be considered by the court may be summarized as follows: usefulness of the product, likelihood it will cause injury and seriousness of the injury; availability of safer substitutes; manufacturer's ability to eliminate the danger; user's ability to avoid the danger; user's knowledge of the danger; and feasibility of risk spreading.[1]

The purpose of strict product liability is to hold a manufacturer responsible for damages attributable to a failure of the product to perform with reasonable safety. It is not to make the manufacturer an insurer against all losses. Montgomery and Owen, "Reflections on the Theory and Administration of Strict Tort Liability for Defective Products," 27 *S.C.L.Rev.* 803, 826 (1976). The strict liability policy of encouraging manufacturers to market a safer product is generally inapplicable where the product is unavoidably unsafe. Strict liability arose in part because of a basic presumption that persons not abusing products are not usually injured unless the manufacturer failed in some respect in designing, manufacturing or marketing the product. The strict liability theory was designed to facilitate redress for the injured user or consumer because of the difficulty in proving negligence. This policy is not advanced when imposing absolute liability. *See id.* at 827–28.

There are occasions where the court has determined as a matter of law because of policy reasons that liability should be imposed even though there is no defect in the product. This is the absolute liability model. The typical example is fixing absolute liability when an ultrahazardous activity causes injury or damage. Liability is imposed irrespective of any wrongdoing by the defendant. *McAndrews v. Collerd,* 42 *N.J.L.* 189 (E. & A. 1880). In this situation the ultimate determination is that the

---

[1]These factors were articulated by Professor Wade, 44 *Miss.L.J.* at 837–38, and we referred to them in *Cepeda* and *Suter.* The majority relies upon them again today.

industry should bear such costs, provided the jury has made the requisite findings on causation and damages.

Factors similar to those used in the risk-utility analysis for products liability are applied in the ultrahazardous activity case. The *Restatement (Second) of Torts* lists these elements:

§ 520. *Abnormally Dangerous Activities*

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

It is conceivable that a court could decide that a manufacturer should have absolute liability for a defect-free product where as a matter of policy liability should be imposed. Suppose a manufacturer produced toy guns for children that emitted hard rubber pellets—an obviously dangerous situation. A court could reasonably conclude that the risks (despite warnings) outweighed the recreational value of the toy, that the manufacturer should bear the costs and that there should be absolute liability to a child injured by the toy.

The *Restatement* also cautions that whether an activity is an abnormally dangerous one so that it should be placed in the ultrahazardous category is to be settled by the court, not the jury. In its comment it states:

The imposition of [absolute] liability, on the other hand, involves a characterization of the defendant's activity or enterprise itself, and a decision as to whether he is free to conduct it at all without becoming subject to liability for the harm that ensues even though he has used all reasonable care. This calls for a decision of the court; and it is no part of the province of the jury to decide whether an industrial enterprise upon which the community's prosperity might depend is located in the wrong place or whether such an activity as blasting is to be permitted without liability in the center of a large city. [3 *Restatement (Second) of Torts* § 520 comment *l*, at 43 (1965)]

It is important to note that the risk-utility analysis is *not* submitted to the jury for the purpose of determining absolute

liability for a class or type of product. Dean Wade has explained that when a whole group or class or type of a product may be unsafe, "the policy issues become very important and the factors [the seven listed in the risk-utility analysis] must be collected and carefully weighed. It is here that the court—whether trial or appellate—does consider these issues in deciding whether to submit the case to the jury." 44 *Miss.L.J.* at 838. *Accord Cepeda v. Cumberland Eng'g Co.,* 76 *N.J.* at 173–75; *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* at 172–73; *see* Green, "Strict Liability Under Sections 402A and 402B: A Decade of Litigation," 54 *Texas L.Rev.* 1185, 1200, 1219 (1976).

When the case is submitted to the jury in strict liability, the jury must decide whether the product is defective and reasonably safe, not whether as a matter of policy the manufacturer should be absolutely liable. In determining questions of defectiveness and safety, *some* of the same risk-utility factors may be pertinent.[2] However, reference to any one of the factors is to be made only when it is relevant and may be of assistance in deciding whether the product is defective and whether it is not reasonably safe. See Dean Wade's comment:

> Should the jury be told about the list of seven factors which were set forth above? The answer should normally be no.... Occasionally, when one of the factors has especial significance, it may be appropriate for the judge to make reference to it in suitable language. [44 *Miss.L.J.* at 840]

We observed in *Suter:*

> Although the considerations for the jury are somewhat comparable to those of the trial court, their decisional functions differ. The court decides what protec-

---

[2]It is anomalous indeed that the majority relies on the Model Jury Charges and the Practitioner's Guide. Those documents support the proposition stated above. The Model Jury Charge states only that "the *appropriate* 'risk-utility' factors should be given to the jury." (emphasis added). The Judicial College material reads:

> Note that the jury is not making a risk/utility analysis. It is considering two, or possibly three of the several factors quoted in *Cepeda* and incorporated by reference in *Suter's* explanation of the Court's role. [W. Dreier & H. Goldman, *Products Liability Law in New Jersey: A Practitioner's Guide—I.C.L.E.* 52 (1982)]

tion should be given and the jury is concerned with reaching a just result as between the parties. [81 *N.J.* at 173]

In *Beshada v. Johns-Mansville Prod. Corp.*, 90 *N.J.* 191 (1982), this Court held that a manufacturer was assumed to know of a dangerous condition at the time of manufacture, even though no one in the scientific community had knowledge of that danger. Despite that fact, the manufacturer was deemed to have had a duty to warn of that condition and to be responsible for not having done so. *Id.* at 209. By denying the state of the art defense, and in effect a warning defense, the Court, relying substantially on "Risk Spreading" and "Accident Avoidance"— elements that would be submitted to a court and not a jury—, sanctioned absolute liability. The Court thereby indicated that the industry should bear the costs of the hazards incident to the use of asbestos, even though there were no defects in the asbestos. *Id.* at 205–07.

Now. the Court goes one step further and decides that a jury may speculate that, though there is no manufacturing flaw, the duty to warn has been satisfied and the manufacturer could not possibly have designed the item in a safer manner, the manufacturer can be absolutely liable because the jury finds that the risk outweighs the product's usefulness. It is not appropriate to foresake uniformity of treatment of a class or type of product by permitting juries to decide these questions. Nor is it appropriate for a jury to make this value judgment in addition to resolving factual issues. Unless the jury is to consider the feasibility of spreading the loss and the intricacies of cost avoidance, *see* Calabresi & Hirschoff, "Toward a Test for Strict Liability in Torts," 81 *Yale L.J.* 1055 (1972), the jury will conduct its inquiry in the absence of evidence of all the elements that should properly be considered in adopting a policy of having the manufacturer spread the loss by setting the price to cover the costs of claims or insurance premiums.

The majority holds that the jury should have been permitted to decide whether the risks of above-ground swimming pools with vinyl bottoms exceed their usefulness despite adequate

warnings and despite unavailability of any other design. The plaintiff had the burden of proving this proposition.[3] Yet he adduced no evidence on many of the factors bearing on the risk-utility analysis. There was no evidence on the extent that these pools are used and enjoyed throughout the country; how many families obtain the recreational benefits of swimming and play during a summer;[4] how many accidents occur in the same period of time; the nature of the injuries and how many result from diving. There was no evidence of the feasibility of risk spreading or of the availability of liability insurance or its cost. There was no evidence introduced to enable one to gauge the effect on the price of the product, with or without insurance. The liability exposures, particularly if today's decision is given retroactive effect, could be financially devastating.

These factors should be given some consideration when deciding the policy question of whether pool manufacturers and, in the final analysis, consumers should bear the costs of accidents arising out of the use of pools when no fault can be attributed to the manufacturer because of a flaw in the pool, unavailability of a better design, or inadequate warning. If this Court wishes to make absolute liability available in product cases and not leave such decisions to the Legislature, it should require that trial courts determine in the first instance as a matter of law what products should be subject to absolute liability. In that event

---

[3]The court has, however, placed the burden of proving compliance with the state of the art on the defendant. Why this should be so is unclear. Our liberal discovery provisions enable a plaintiff to obtain all the information known to the defendant and since the burden of proof of a defect rests with the plaintiff, it is incongruous to shift that burden to the defendant when plaintiff charges that there is a design defect. *See* 2 R. Hursh & H. Bailey, *American Law of Products Liability 2d* § 9:17, at 300–01 (1974).

[4]Justice Pashman (then Judge) observed in *N.J. Sports & Exposition Authority v. McCrane,* 119 *N.J.Super.* 457, 492 (Law Div.1971), aff'd, 61 *N.J.* 1, appeal dismissed *sub nom. Borough of East Rutherford v. N.J. Sports & Exposition Authority,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.2d* 215 (1972): "Sports are absolutely essential to the public welfare."

the court would consider all relevant factors including those utilized in the risk-utility analysis.

The difference between absolute and strict liability is not one of semantics. Significantly different elements are evaluated by different entities with different standards of review. As used in this opinion, "strict liability" and "absolute liability" signify distinct and separate concepts. Strict liability is imposed where there is a defect in a product due to an individual product flaw, an improper design or an inadequate warning. *See supra* at 193. Irrespective of strict liability, a manufacturer or other seller may nevertheless be liable in an appropriate case under *absolute* liability. Absolute liability is imposed where, on the basis of policy considerations including risk-spreading, it is determined that a manufacturer or other seller should bear the cost of injuries he causes to foreseeable users, regardless of the presence or absence of any defect. In some circumstances a manufacturer may be liable though a product is free from defects.

The majority's view of "strict liability" encompasses both strict liability and absolute liability. Although the majority and I adopt the same formulaic statement that strict liability is imposed only where there is a "defect," *see ante* at 180, the majority uses the term to include not only individual product flaw, improper design and inadequate warning cases, but also a fourth category of cases in which the jury decides that the risks outweigh the utility of the product. It follows from the majority's rationale that a jury may be permitted to find that there is a "defect" whenever there is an accident involving a product.

I join in the result, however. There was proof that the pool liner was slippery and that the vinyl bottom could have been thicker and the embossing deeper. As the majority states, a "fair inference could be drawn that deeper embossing would have rendered the pool bottom less slippery." *Ante* at 179. The plaintiff's theory was that the dangerous condition was the extreme slipperiness of the bottom. Viewing the facts favor-

ably from the plaintiff's frame of reference, I would agree that he had some proof that the pool was incorrectly designed and therefore was defective. This issue, together with causation, should have been submitted to the jury.

Other than as stated herein, I join in the majority's opinion and concur in the judgment reversing and remanding the matter for a new trial.

CLIFFORD, J., concurring in the result.

*For affirmance as modified*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK and O'HERN—5.

*Concurring and dissenting*—Justice SCHREIBER—1.