482 A.2d 260

**William A. McKAY, Appellant,**

v.

**SANDMOLD SYSTEMS, INC., Jeltema Electrical, Inc., Beardsley & Piper, Inc. and Pettibone Corporation.**

Superior Court of Pennsylvania.

Argued Jan. 26, 1984.

Filed Sept. 14, 1984.

Petition for Allowance of Appeal Denied March 22, 1985.

Barry M. Simpson, Pittsburgh, for appellant.

Louis C. Long, Pittsburgh, for appellees.

Before WIEAND, TAMILIA and POPOVICH, JJ.

WIEAND, Judge:

In a product liability case involving an alleged defect in the design of industrial machinery, how shall a jury be instructed? What standard shall be applied to determine whether the injury producing machinery was defectively designed? These are the issues presented by the present appeal. They are complex issues and not easily answered. In recent years, the development of the law of products liability in design defect cases has "turned into a swampy quagmire." J. Wade, *On Product "Design Defects" and Their Actionability*, 33 Vand.L.Rev. 551, 557 (1980).

William A. McKay, the appellant, was injured by the rotating plow blades of a muller when a fellow foundry worker pushed a starter button and started the machine while McKay was inside the plow area. In an action against Beardsley & Piper, Inc., the manufacturer of the muller, McKay contended that the muller had been defectively designed because it failed to contain an interlock or limit switch which would have made it impossible to start the muller while the inspection door was in an open position. McKay had entered the plow area of the muller through the inspection door to make repairs. He pulled a disconnect button when he entered and the door remained open. He assumed that the supply of electricity would thus be disconnected, but he did not "lock out" the disconnect or test the muller to verify that the electrical supply had been properly

disconnected. A short time later, the operator of the muller activated the muller in order to make use of it as a part of the foundry's sand return system. The operator was unaware that McKay had entered the plow area for maintenance purposes. A jury found that the muller had not been defectively designed and returned a verdict for Beardsley & Piper, Inc., the appellee.[1] Post-trial motions were denied, and judgment was entered on the verdict.

The trial court left it to the jury to determine whether the muller had been designed defectively. It told the jury that appellee was a guarantor of the safety of its product. It said the appellant "must prove to your satisfaction that the product which was sold by the manufacturer was defective at the time it was sold" because it "did not have a limit switch on the door through which the plaintiff entered on the occasion of this accident." The court did not otherwise define "defective" and provided the jury with no standard which it should apply in determining whether the muller had been defectively designed. The trial court rejected specific points for charge submitted by appellant as follows:

2. The Manufacturer of a product is the guarantor of its safety. The product must, therefore, be provided with every element necessary to make it safe for use, and without any condition that makes it unsafe for use.

3. If you find that the muller, at the time it left Beardsley & Piper's control, lacked any element necessary to make it safe for use or contained any condition that made it unsafe for use, then the muller was defective, and Beardsley & Piper is liable for all harm caused by the defect.

Appellant contends that this was error.

In *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978), the Supreme Court said:

1. The jury also found that Sandmold Systems, Inc. and Jeltema Electrical, Inc. had not been negligent in effecting installation of the muller at the foundry of McConway & Torley Corporation. This finding is not challenged in the present appeal.

It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint. *Id.*, 480 Pa. at 558, 391 A.2d at 1026. We read this as a reaffirmation of the traditional role of a trial court in determining the adequacy of a plaintiff's evidence to require submission of the cause to a jury. It is the same determination which a trial court makes in response to a defense motion for compulsory nonsuit or for directed verdict. See: *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 467 A.2d 615 (1983).

The *Azzarello* court then proceeded to fashion a test to be used in determining those instances in which liability should attach in "design defect" cases. It quoted from its decision in *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 32, 319 A.2d 903, 907 (1974) that a manufacturer "is effectively the guarantor of his product's safety ..." and "impliedly represents that it is safe for its intended use." *Azzarello v. Black Brothers Co.*, *supra*, 480 Pa., at 558–559, 391 A.2d at 1026. It also quoted from *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 100, 337 A.2d 893, 902 (1975) that "[t]he seller must provide with the product every element to make it safe for use." Then, the Court concluded:

> For the term guarantor to have any meaning in this context the supplier must at least provide a product which is designed to make it safe for the intended use. Under this standard, in this type case, the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use. It is clear that the term "unreasonably dangerous" has no place in the instructions to a jury as to the question of "defect" in this type of case.

*Azzarello v. Black Brothers Co.*, *supra*, 480 Pa., at 559, 391 A.2d at 1027 (footnotes omitted). In a footnote the

Court suggested that an adequate charge to a jury, which would express the concept of "defect" while avoiding interjection of negligence concepts, would be as follows:

The [supplier] of a product is the guarantor of its safety. The product must, therefore, be provided with every element necessary to make it safe for [its intended] use, and without any condition that makes it unsafe for [its intended] use. If you find that the product, at the time it left the defendant's control, lacked any element necessary to make it safe for [its intended] use or contained any condition that made it unsafe for [its intended] use, then the product was defective, and the defendant is liable for all harm caused by such defect.

*Id.*, 480 Pa. at 559–560 n. 12, 391 A.2d at 1027 n. 12.

This is the instruction which appellant requested in the instant case. The decision in *Azzarello* suggests that it was error for the trial court to refuse to charge the jury as requested by appellant. This error requires that a new trial be granted.

However, because the instruction proposed by the *Azzarello* court has been subjected to such sharp criticism and because a literal use thereof will move Pennsylvania beyond "strict liability" for defective products and create "absolute liability" for harm caused by manufactured products, we choose to examine more closely the instructions to be given juries in design defect cases in the hope that it will be helpful in the developing law of products liability in this Commonwealth.

Professor James A. Henderson, Jr., of Boston University, is most outspoken in his criticism of the test announced in *Azzarello.* He writes:

*Read literally, this definition constitutes a radical departure from the growing consensus that cost-benefit analysis is the appropriate analytic method for determining the design defect issue in close cases. The element that distinguishes this new test from the emerging consensus, of course, is the apparently deliberate elimination of the modifier "reasonable" in con-*

*nection with the adjective "safe." Taken literally, this test condemns as defective any product design that exposes its users to risks, regardless of whether those risks are justified in light of associated benefits.*

Combining the several aspects of this unusual decision, a two-step approach emerges: First, the trial judge must screen the adequacy of the plaintiff's averments in the complaint, somehow employing a cost-benefit analysis to determine the unreasonableness of the design-related risks as a matter of law. *Then, assuming that the case is appropriate for jury consideration, the court must instruct the jury to decide the liability issue on the basis of whether the design could possibly (rather than reasonably) have been made safer for its intended use. Viewed most charitably, such an approach to the design defect issue is confused and unworkable. Viewed realistically, the new test announced in Azzarello encourages juries to impose liability merely because plaintiffs have somehow been injured while using defendant's products.*

J. Henderson, *Renewed Judicial Controversy over Defective Product Design: Toward the Preservation of an Emerging Consensus*, 63 Minn.L.Rev. 773, 801 (1979) (emphasis added).

Writing critically of the jury instruction suggested in *Azzarello*, Sheila L. Birnbaum, Professor of Law at New York University Law School, says:

Is there any product that cannot be made safer in some way? *This instruction calls forth fantastic cartoon images of products, both simple and complex, laden with fail-safe mechanism atop fail-safe mechanism....*

. . . .

... The only function left for the jury under *Azzarello* is to determine whether the product left the supplier's control lacking *any* element necessary for its intended use or possessing *any* feature that renders it unsafe for the intended use. Thus, the question of reasonableness may not be considered by the jury even in a closely contested case.

S. Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand.L.Rev. 593, 637–639 (1980) (emphasis added) (footnote omitted).

Even Dean Wade, who was quoted extensively in *Azzarello,* has criticized the test formulated by the Court in that decision. He writes:

> We come then to the test to be used in determining whether the product itself is actionable. Some recent cases have gone to extremes in both directions on this matter. Several cases, for example, have taken the position that a product is actionable unless it meets a standard of safety that is much higher in strict liability cases than in a negligence action. Thus, while the Pennsylvania court in *Azzarello* denied that it was imposing an insurer's liability, the supplier has been cast "in the role of a guarantor of his product's safety." Moreover, the Pennsylvania cases hold that the product is defective if it is "lacking *any* element necessary to make it safe for its intended use or possessing *any* feature that renders it unsafe for the intended use...."
>
> *How, one may ask, could any automobile today turn out not to be actionable under these tests?* In a collision an automobile may possibly catch fire—no matter where the gas tank is located or how it is protected. Should we require every car to have an automatic sprinkling system, regardless of how that might affect its gasoline mileage? A governor limiting the speed to ten miles per hour would make it much safer—but probably not safe enough. Clearly, safety must be a relative matter, and a balancing process of some sort is necessary to determine whether a product is sufficiently safe—regardless of whether the suit is in negligence or in strict liability.

J. Wade, *supra,* 33 Vand.L.Rev. at 567–568 (emphasis added) (footnotes omitted).

The *Azzarello* test can be made more meaningful by the simple expedient of reinserting the word "reasonable."

Thus, a product would be defective if it could *reasonably* have been made safer for its intended use. This would preserve "the use of familiar terms and thought processes with which courts, lawyers, and jurors customarily deal." *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 493, 525 P.2d 1033, 1037 (1974). It would do so without returning to a pure negligence approach and would conform to the developing consensus that liability in design cases is to be determined by a balancing of benefits and risks. This approach requires an assessment of the relative costs and benefits of the manufacturer's design and safer alternatives in order to determine whether a product design is unreasonably dangerous and therefore legally defective. Included among the factors to be considered "are the utility of the product to its user and to the public as a whole, the likelihood that it will cause injury and the probable seriousness of the injury, and the manufacturer's ability to eliminate the unsafe character of the products [sic] without impairing its utility or making it too expensive." J. Henderson, *supra*, 63 Minn.L.Rev. at 776 (footnote omitted). Accord: W. Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles*, 45 Mo.L. Rev. 579, 592–593 (1980); J. Wade, *On the Nature of Strict Liability for Products*, 44 Miss.L.J. 825, 837–838 (1973); 2 L. Frumer & M. Friedman, *Products Liability* § 16A[4][f][iv] (rev. ed. 1983). See, e.g.: *Kerns v. Engelke*, 76 Ill.2d 154, 164–167, 28 Ill.Dec. 500, 505–506, 390 N.E.2d 859, 864–865 (1979) (farm machinery designed without protective system for detachable power assembly which struck plaintiff while machine in transit); *Turner v. General Motors Corp.*, 584 S.W.2d 844, 851 (Tex.1979) (automobile design rendering vehicle "uncrashworthy"). See also: *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 884–885 (Alaska 1979) (front end loader lacking roll-over protective shield); *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 432, 143 Cal.Rptr. 225, 238, 573 P.2d 443, 456 (1978) ("high-lift" front-end loader lacking stabilizer, seat belts, and roll-bar); *Elsworth v. Beech Aircraft Corp.*, 147 Cal.App.3d 384, 391, 195 Cal.Rptr. 226, 231 (1983) (airplane designed so as to

have an undue tendency to stall and spin); *Ontai v. Straub Clinic and Hospital, Inc.*, 659 P.2d 734, 739–740 (Hawaii 1983) (x-ray table designed to raise patient to vertical position lacking adequate locking mechanism for footrest); *O'Brien v. Muskin Corp.*, 94 N.J. 169, 181, 463 A.2d 298, 304 (1983) (aboveground swimming pool with design conducive to diving-related injuries; *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204, 208 (1983) (blade guard on circular saw allowing excessive amount of blade to be exposed); *Cremeans v. International Harvester Co.*, 6 Ohio St.3d 232, ——, 452 N.E.2d 1281, 1284 (1983) (tractor without roll bar). This balancing test takes into account the "state of the art" with respect to precautions available to the manufacturer, but the "state of the art" is not conclusive.

Since *Azzarello,* the Model Uniform Product Liability Act (UPLA) has been published by the Department of Commerce.[2] Section 104 would impose upon an injured claimant the burden of proving "by a preponderance of the evidence that the claimant's harm was proximately caused because the product was defective." 44 Fed.Reg. 62,714, 62,721 (1979). The same section suggests that a product is defective only if it is shown to be "unreasonably unsafe." *Id.* In order to ascertain if a product is unreasonably unsafe in design, the trier of fact should be instructed in terms of balancing factors of risk and utility. S. Birnbaum, *supra,* 33 Vand.L.Rev. at 640. Specifically, the trier of fact is called upon to balance "(1) the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms; against (2) the manufacturer's burden of designing a product that would have prevented those harms, and the adverse effect that alternative design

**2.** See: 44 Fed.Reg. 62,714 et seq. (1979). UPLA originated with the Federal Interagency Task Force on Product Liability, appointed by President Carter, which conducted an 18 month interagency study on products liability and published a final report on November 1, 1977. As a result of that study and following input from a variety of sources, the Department of Commerce published the final draft of UPLA in the Federal Register on October 31, 1979. For an analysis of the UPLA, see T. Dworkin, *Product Liability Reform and the Model Uniform Product Liability Act,* 60 Neb.L.R. 50 (1981).

244

would have on the usefulness of the product." 44 Fed.Reg. at 62,723. See: *Kerns v. Engelke, supra*, 76 Ill.2d, at 164–167, 28 Ill.Dec. at 505–506, 390 N.E.2d at 864–865; *Turner v. General Motors Corp., supra* at 851.

The jury instructions requested by appellant in the instant case and required by *Azzarello* will have the effect of rendering appellee absolutely liable for the injuries sustained by appellant. Section 402A of the Restatement (Second) of Torts, however, has imposed strict liability upon a manufacturer for a defective product; it has not imposed absolute liability for all risks inherent in the use of a product. A preferable instruction, therefore, would require a jury to balance the benefits and risks inherent in a product in order to determine whether the manufacturer placed a defectively designed product on the market. In applying this test a jury should balance the likelihood that the product would cause injury and the probable seriousness of the injury against the utility of the product to the public as a whole and the manufacturer's ability to eliminate the unsafe characteristics of the product without impairing its utility or making it too expensive.

This was the issue towards which the evidence in the instant case was directed. Appellee's liability depended upon whether the muller was rendered defective because it could be activated while the inspection or access door was open. Appellant contended that the lack of a limit switch rendered the muller defective. Appellee countered that it had considered using such a switch in designing the machine but had consciously decided that such a device would decrease efficiency of the machine without a corresponding increase in safety.

Under these circumstances, appellant was entitled to have the jury instructed regarding the standard to be applied in determining whether the muller manufactured by appellee had been defective. It was the duty of the trial court to clarify the issues to be decided by the jury and to assist the jurors in applying the law to the issues. See: *Kimmel v. Yellow Cab Co.*, 414 Pa. 559, 201 A.2d 417 (1964); *Hronis v. Wissinger*, 412 Pa. 434, 194 A.2d 885 (1963); *Bromberg v.*

*Gekoski,* 410 Pa. 320, 189 A.2d 176 (1963); *Butler v. DeLuca,* 329 Pa.Super. 383, 478 A.2d 840 (1984); 10 Pa.Std.Prac. § 59:1. In strict liability cases under section 402A, utilization of the term "defective" without defining it to the jurors "is almost to ensure that they will be misled." J. Wade, *supra,* 44 Miss.L.J. at 832. Accord: *Barker v. Lull Engineering Co., supra,* 20 Cal.3d, at 428, 143 Cal.Rptr. at 235, 573 P.2d at 453. Accordingly, the failure of the trial court to define the concept of "defectiveness" so as to permit a rational determination thereof was error and requires the granting of a new trial.

■ We have suggested a balancing test that would move the courts of this Commonwealth closer to the consensus emerging among the courts of other jurisdictions. Nevertheless, we recognize that it is not within our province to change the existing law in this state. We are charged, rather, with following and enforcing those principles which have been adopted and announced by the Supreme Court. The present state of the law is as set forth in *Azzarello,* and, in accordance therewith, appellant was entitled to have the jury instructed as he requested.

Reversed and remanded for a new trial.

POPOVICH, J., concurs in the result.