527 A.2d 140

**James A. STAYMATES, Jr.**

v.

**ITT HOLUB INDUSTRIES, a DIVISION of INTERNATIONAL TELEPHONE and TELEGRAPH CORPORATION, Appellants.**

**Appeal of CINCINNATI FAN AND VENTILATOR COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 3, 1986.

Filed June 2, 1987.

38

Frederick N. Egler, Jr., Pittsburgh, for appellants.

Irving M. Portnoy, Pittsburgh, for appellee.

Before CIRILLO, President Judge, and ROWLEY and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from a judgment (verdict and delay damages) of $171,350.00 entered against the defendant and additional defendant, ITT Holub Industries and Cincinnati Fan and Ventilator Company, respectively.[1]  We reverse.

1. The defendant First Seneca Bank and Trust Company, successor to defendant Keystone Bank, was dismissed from the case when its motion for summary judgment was granted.  As for Metwood Industrial, the jury entered its verdict against the defendants ITT Holub Industries and Cincinnati Fan and Ventilator Company only.  Thus, no appeal is presently before us as to Metwood Industrial.

The facts, viewed in a light most favorable to the verdict-winner, reveal that on the 26th day of May, 1979, the plaintiff James A. Staymates, Jr., as general foreman for Paul Bunyan Rustic Furniture Company, was making a tour of the plant to assess the progress of an order that had to be shipped that day. As he approached the sanding area, Robert Ault was feeding the automatic sander and Thomas Garrity was stacking the boards being emitted.

The dust and wood chips produced by the sanding action were carried, by means of a hose situated atop the sander through which air flowed, to a dust collector. The air stream (suction) was generated by a motorized impeller (fan) contained within the dust collector housing and gravity would cause the heavier, incoming wood particles to fall into a 55–gallon drum upon which the dust collector sat. The lighter particles would be propelled into a cloth bag, 19–square feet in size, attached by a ring clamp to the discharge port of the dust collector. The accompanying air would be expelled through the porous bag.

As the plaintiff stood eight to ten feet away from the dust collector, the cloth bag blew off and landed at his feet. He "instinctively" grabbed the bag and yelled to someone (Ault or Garrity) to "Shut it down." Then, with his arms fully extended, and a great deal of dust blowing in his face, he moved toward the discharge port to "capture as much dust into the bag or cut down as much flow of the dust into the air as [he] could" to prevent the tables (8–10) located nearby to dry for that day's delivery from being ruined. Next, as described by the plaintiff:

> ... I don't know exactly what happened. All I know was, like pushing against a door that was stuck, that I was pushing very hard, and all of a sudden it gave, and my hand went into the machine.

Neither the plaintiff nor any of the witnesses who testified could recall whether the dust collector had been turned off at the time of his injury. Even if it had been shut down, testimony indicated that the impeller blade rotated freely

with the power off until it gradually came to a complete stop.

The entire incident took place within a few seconds and resulted in the plaintiff sustaining permanent injury to the fingers on his right hand.

On March 4, 1981, a three-count complaint in trespass was filed alleging the design and manufacture of a defective product (Ace Dust Collector, Model A–27) by ITT Holub Industries, and its ultimate sale or distribution, through Metwood Industrial (distributor) and First Seneca Bank and Trust Company (lessor), to the plaintiff's employer (lessee).

It was alleged that the "product's defective condition" was the proximate cause of the plaintiff's injury and was in existence "[a]t the time of the sale or distribution ... by the Defendants." Thus, it was asserted, each was strictly liable for the resultant damages incurred. Further, the plaintiff sought recovery on the basis of negligence and breach of warranty by the named defendants as alternative grounds for his recoupment of damages.

On April 29, 1981, ITT Holub Industries filed a complaint to join Cincinnati Fan and Ventilator Company as an additional defendant on the grounds that it (Cincinnati Fan) "designed, manufactured, produced and sold the Dust Collector that is the subject of the Plaintiff's claim." For the reasons just recited, assuming that the product was found to be unfit or defective, ITT Holub Industries averred that Cincinnati Fan was solely liable.

After the interchange of interrogatories, the taking of depositions and the securement of relevant documents and reports, the case came to trial and resulted in a jury award in favor of the plaintiff and against the defendant and additional defendant. With the denial of post-verdict motions and the reduction of the verdict to judgment, this timely appeal followed.

The defendant and additional defendant, represented by the same counsel at trial and on appeal, raise five issues for our consideration. The first charges the trial court with

error in refusing to submit the issue of the plaintiff's comparative negligence to the jury. This question, as noted by the plaintiff in his brief to us, is unprecedented in this Commonwealth given that the negligence phase of the case was premised only upon the provisions of Section 402A of the Restatement (Second) of Torts, and the liability aspect was based solely upon strict liability in tort. The appellants likewise agree that the question presented is one of first impression and would have us adopt the approach taken by a number of other jurisdictions[2] and apply the law of comparative negligence to strict liability cases involving a claimed defective product.

In this country, strict liability had its origin in the ancient rule that one who engaged in a business of supplying individuals with products, which might endanger their safety or property, owed a "special responsibility" to make sure that the product was not "defective" so as to be "unreasonably dangerous" to the user or consumer. Restatement (Second) of Torts § 402A, Comments *f* and *g*. This concept "represented a departure from, and an exception to, the general rule that a supplier of chattels was not liable to third persons in the absence of negligence or privity of contract." Id. at Comments *b* and *l*. Liability was based purely on the law of tort, i.e., a legal wrong committed upon the person or property of another independent of a contract. Black's Law Dictionary 1660 (4th Ed. 1968). Of course, recovery in tort was and is premised upon the existence of a legal duty owed by the defendant to the plaintiff, a breach of that duty and damages flowing to the plaintiff as a proximate result thereof. Id.

2. See *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984); *Star Furniture Co. v. Pulaski Furniture Co.,* 297 S.E.2d 854 (W.Va.1982); *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978); see also *Bowling, Admx. v. Jake Sweeney Chevrolet, Inc.,* No. 84–05–054 (Ohio App., March 31, 1986) [Available on WESTLAW, OH–CS database]; *Thibault v. Sears, Roebuck & Co.,* 118 N.H. 802, 395 A.2d 843 (1978); *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.,* 411 F.Supp. 598 (D.Idaho 1976); *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967).

It was the belief of the drafters of the Restatement (Second) of Torts that the burden of accidental injuries caused by products placed in the stream of commerce be shouldered by those "who market the products", and the cost of such injuries "be treated as a cost of production against which liability insurance can be obtained[.]" Restatement (Second) of Torts § 402A, Comment *c.* Pennsylvania has adopted the principles enunciated in Section 402A.[3] See *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966).

As of the date of this opinion, the concept of strict liability, as being devoid of notions of negligence, has remained intact in this jurisdiction.

To explain, in *McCown v. International Harvester Co.,* 463 Pa. 13, 342 A.2d 381 (1975) the Court was confronted with the issue of the applicability of contributory negligence as a defense to a Section 402A action.

The manufacturer conceded that its steering mechanism was defective but asked that the plaintiff's contributory negligence be considered in calculating the amount of recovery awarded since the plaintiff's own negligence triggered the sequence of events (which included a defectively designed steering column) leading to his injuries.

In the course of refusing to sanction the use of contributory negligence as a defense in Section 402A cases, the Court observed that the defendant's apportionment-of-fault argument would create a system of comparative assessment of damages for Section 402A actions. Because neither the

3. Section 402A provides:
   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property, if
   (a) The seller is engaged in the business of selling such a product, and
   (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
   (a) The seller has exercised all possible care in the preparation and sale of his product, and
   (b) The user or consumer has not bought the product from or entered into any contractual relation with the seller.

Legislature nor the Court had established such a scheme in any area of tort law, "[w]ithout considering the relative merits of comparative negligence, [the Court] th[ought] it unwise to embrace the theory in the context of an appeal involving Section 402A." 463 Pa. at 16, 342 A.2d at 382. It was also pointed out that: "To initially apply a theory of comparative negligence to an area of the law in which liability is not premised on negligence seems particularly inappropriate." 463 Pa. at 16 n. 3, 342 A.2d at 382 n. 3.

Granted, this approach to an admixture of comparative negligence with strict liability preceded Pennsylvania's enactment of its comparative negligence statute;[4] nonetheless, as noted by one federal court,

> ... it [*McCown*] provides a clear indication of the direction the Court was taking with respect to its product liability doctrine. At a minimum, the Court made apparent its firm belief that negligence concepts did not belong in product liability cases. This has been the theme of several opinions by the Court in an effort to differentiate or police negligence concepts from developing concepts of product liability law. *See, e.g. Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975).

*Bike v. American Motors Corp.*, 101 F.R.D. 77, 80 (E.D.Pa. 1984). To the same effect see *Holloway v. J.B. Systems, Ltd.*, 609 F.2d 1069, 1073 (3rd Cir.1979) ("We read *Azzarello* as a signal that evidence and jury instructions regarding negligence concepts should be kept out of cases brought

---

4. It reads:

> (a) **General rule.**—In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

The Act of April 28, 1978, P.L. 202, No. 53, § 10(89), effective June 27, 1978, 42 Pa.C.S. § 7102(a).

under § 402A."); *Baker v. Outboard Marine Corp.*, 595 F.2d 176, 183 (3rd Cir.1979) (The Court held that the district court committed reversible error in a strict liability case by using negligence terminology, i.e., "unreasonably dangerous", in its charge to the jury); *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 766–67 (3rd Cir.1977) ("We believe that *McCown v. International Harvester Co., supra,* is evidence that Pennsylvania's courts would not allow the introduction of ... comparative negligence principles into a § 402A case...."); *Conti v. Ford Motor Co.*, 578 F.Supp. 1429, 1434 (E.D.Pa.1984), rev'd on other grounds, 743 F.2d 195 (3rd Cir.1984), cert. denied, 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 784 (1985) ("The Pennsylvania Supreme Court, perhaps more than any other state appellate court in the nation, has been emphatic in divorcing negligence concepts from product-liability doctrine. *See, e.g., Berkebile* [, supra]; *Azzarello* [, supra]. * * * [Judge Fullam] believe[d] it unlikely that, given *Azzarello,* that court would hold that the liability of a manufacturer for a defective product is equivalent to 'causal negligence' which is to be apportioned under the [comparative negligence] statute.").

This approach of divorcing comparative negligence principles from Section 402A law was most recently re-affirmed by an en banc panel of this Court in *Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408 (1984), appeal dismissed, 508 Pa. 643, 500 A.2d 428 (1985).

In *Dambacher,* a products liability case, the absence of a warning embossed on a radial tire that it should not be mixed with non-radials, and that a vehicular accident occurred injuring the plaintiff because the tire was mixed with non-radials, was one of the issues addressed in the context of what instructions should be given to the jury at the new trial.

The plaintiff sued the driver of the vehicle in which she was a passenger and its owner in negligence, while the retailer (Sears) was sued in strict liability. A verdict was returned in favor of the plaintiff, and responsibility was apportioned under Pennsylvania's Comparative Negligence

Act among the defendants (driver—50%; Sears—45%; Department of Transportation—5%).

On appeal, although concluding · that a new trial was warranted because the trial court erred in admitting the testimony of the plaintiff's expert on the cause of the accident, this Court commented (in dictum) on how the trial court should instruct the jury on Sears' strict liability. In doing so, we relied on *Azzarello's* distinction between products liability cases and negligence cases; namely:

> It was on the basis of the distinction between products liability theory, under which the defendant as manufacturer or supplier is guarantor of its product, and negligence theory, under which the defendant is held to the standard of a reasonable man, that the Court in *Azzarello* rejected the use of the negligence term "unreasonably dangerous" in products liability cases. We see no reason to depart from that reasoning now. To the contrary, it is sound, both as a matter of legal theory and in its practical consequences. Thus, quite independently of the precedential authority of *Azzarello,* we hold, as the Supreme Court did there, that in a strict liability case, principles of negligence have no place.

336 Pa.Super. at 59–60, 485 A.2d at 428 (Footnote omitted). See also Concurring Opinion of Justice Hutchinson in *Sherk v. Daisy-Heddon,* 498 Pa. 594, 605, 450 A.2d 615, 621 (1982) ("The liability imposed on manufacturers of defective products is denominated strict, or without fault...."); *Pitcavage v. Mastercraft Boat Co.,* 632 F.Supp. 842, 847–48 n. 5 (M.D.Pa.1985) ("... fault concepts have no place in a strict liability ... action...."); *Capuano v. Echo Bicycle Co.,* 27 D. & C.3d 524, 532 (Northampton Cty. 1982) ("... it is clear that the Pennsylvania Comparative Negligence Statute ... does not apply with respect to a strict liability defendant.").

◼ We are quite aware that a number of states have taken the initiative, be it by judicial decision or legislative enactment, to apply comparative negligence principles to

strict products liability.[5]  However, in the absence of any indication from our Supreme Court that it is willing to alter its stance, first made reference to in *McCown,* favoring a retention of the dichotomy between strict liability and comparative negligence in the area of products liability, we find it inauspicious at this time to follow suit with some of our sister states who have opted to meld strict liability principles with notions of comparative negligence.  This is especially so since strict liability came about in this Commonwealth as a result of judicial fiat by our Supreme Court.  Thus, if any modification of Section 402A cases is to emerge, it should have its genesis from the same Court or the Legislature.  Neither has spoken on this subject.

Before leaving this issue, we would make one last comment.  It deals with the fact that Pennsylvania's Comparative Negligence Act subsumed the doctrine of contributory negligence (*Vargus v. Pitman Mfg. Co.,* 510 F.Supp. 116, 119 (E.D.Pa.1981)), and, by its own terms, is applicable only to "actions brought to recover damages for negligence." 42 Pa.C.S. § 7102(a).  And, as is documented in case law and treatises on the subject, strict liability imposes accountability on the manufacturer without the plaintiff first having to prove "fault", nor is an apportionment of the damages called for under Section 402A.  See *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975); *McCown,* supra; see also *Sherk,* supra; Prosser, Law of Torts §§ 75, 79 (4th Ed. 1975); Timby & Plevyak, The Effect of Pennsylvania's Comparative Negligence Statute On Traditional Tort Concepts and Doctrines, 24 Vill.L.Rev. 453 (1978).

In effect, strict liability dispensed with the harsh result which occurred when a plaintiff was denied recovery in a case where he was only slightly negligent.  See Prosser,

5.  The highest courts of seventeen states and one territory have done so, while nine state legislatures have enacted statutes which make comparative negligence principles applicable to strict products liability.  For a listing of these jurisdictions and the case citings see Comment, Comparative Negligence and Strict Products Liability: Where Do We Stand?  Where Do We Go?, 29 Vill.L.Rev. 695 (1984).

supra at § 67; Prosser, Comparative Negligence, 41 Calif.L. Rev. 1, 4 (1953). Today, even under the Comparative Negligence Act, Pennsylvania has adopted a policy under which a plaintiff's conduct may still bar recovery if the plaintiff is found more negligent than the defendant. Therefore, to the extent that plaintiff's negligence exceeded defendant's, the plaintiff would be precluded from recovery and we would be returning to pre–402A times, i.e., a resurrection of contributory negligence as a bar to recovery, a result specifically denounced by our Supreme Court in *McCown*. Further, such an approach would be at odds with Section 402A, which eschews the use of contributory negligence as a defense in a strict products liability case. See Comment *n*.

Society's concern, that the increasing complexity of the manufacturing and distributional processes would have a negative effect upon the plaintiff's ability to prove negligence, was the motivating force for holding the manufacturer accountable (as a guarantor of his product's safety) for injuries sustained by a user or consumer. See *Berkebile*, supra; *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 32, 319 A.2d 903, 907 (1974). This same concern has not evaporated and is no less prevalent today than it was when Section 402A was incorporated into the law of Pennsylvania in 1966. Therefore, the liability incurred by the manufacturer with the presentment of a defective product into the stream of commerce can still be factored into the cost of doing business, and, as always, be passed on to the consuming public. The defendants' contentions to the contrary are more illusory than real and will not be permitted to convert the strict liability doctrine in this Commonwealth into a hybrid version of comparative negligence. Stated simply, we can discern no justification, as the law presently stands in this jurisdiction, to apply comparative negligence precepts to the law of strict products liability.

Notwithstanding the consensus emerging among the courts of other jurisdictions on the use of comparative negligence in strict liability suits, we recognize that it is not within our province to change the existing law, at least as

we perceive it, in this Commonwealth. We are charged with complying with those principles adopted and announced by our Supreme Court. Our view of the present state of the law on the issue before us is, we believe, controlled by *McCown* and its progeny (e.g., *Azzarello*), and, in accordance therewith, the defendants are not entitled to the relief requested. See *Conti,* supra at 1434–35; *McKay v. Sandmold Systems, Inc.,* 333 Pa.Super. 235, 245, 482 A.2d 260, 266 (1984); Timby & Plevyak, supra at 476.

We can now turn to the second issue proffered by the defendants, which contends that the trial court erred in failing to grant their motion for compulsory non-suit because of the plaintiff's alleged assumption of the risk of his injury.

We must bear in mind that the evidence must be read in the light most favorable to Staymates, as well as all reasonable inferences arising therefrom, in deciding whether the plaintiff knew of the defect and voluntarily and unreasonably proceeded to use the product or encounter a known danger to constitute a complete defense to the strict liability action. *Ferraro v. Ford Motor Co.,* 423 Pa. 324, 223 A.2d 746 (1966).

■ Additionally, voluntary assumption of risk must rest upon the subjective awareness of the defect; this cognizance can be proven by circumstantial evidence sufficient to permit an inference that the user was aware thereof and understood the risk. *Weaver v. Clabaugh,* 255 Pa.Super. 532, 536, 388 A.2d 1094, 1096 (1978); Restatement (Second) of Torts § 496D, Comment *d.* "Whether the plaintiff knows of the existence of the risk, or whether he understands and appreciates its magnitude and its unreasonable character, is a question of fact, usually to be determined by the jury under proper instructions from the court. The court may itself determine the issue only where reasonable men could not differ as to the conclusion." Restatement (Second) of Torts § 496D, Comment *e.*

Applying the preceding to the case at bar, we notice that the plaintiff admitted being "generally familiar with the

fact that there was an impeller" inside an exhaust port which had no guard or screen. However, he never examined it because there was no reason for him to do so. Also, the plaintiff stated that in his prior job he had sold dust collectors, but he had never had experience with dust collectors of the type placed at Paul Bunyan. All the plaintiff was ever told about the dust collector during demonstrations at Metwood Industrial and at Paul Bunyan before its securement was that it was "much like a vacuum that you would use around your home but much larger—and that's about it."

The plaintiff testified that he never performed any maintenance or repairs on the dust collector. Further, although the plaintiff trained other employees in the shop on how to operate the sander, the same was not true as to the dust collector. As for operating the dust collector with the power "on", the plaintiff remarked: "The danger was not necessarily readily apparent."

■ Additionally, the plaintiff and his witnesses denied being given a manual on the operation of the dust collector. This was contradicted by a witness for the defendants whose job it was to insert such a manual/instructions in all dust collectors shipped. There was also disagreement as to the inclusion of an "extension" with the paraphernalia shipped with the dust collector to Paul Bunyan. This unit was to have been attached to (and located between) the exhaust port and the cloth bag of the dust collector. Further, the experts for both sides were at odds as to whether this "extension", if it were ever received, would have made the product safer. Accordingly, the trial court properly deferred to the jury the resolution of the factual discrepancies, and, because the plaintiff did not believe that his hands were in an unsafe position, the jury was justified in concluding that he had not in fact assumed the risk of injury. See *Rutter v. The Northeastern Beaver County School District*, 496 Pa. 590, 601, 437 A.2d 1198, 1203 (1981); *Burch v. Sears, Roebuck and Co.*, 320 Pa.Super. 444, 452, 467 A.2d 615, 619 (1983). On this same basis we find the case of

*Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603 (1968) to be distinguishable in that there the plaintiff *voluntarily* put himself at an obvious risk by reaching into a moving glass-breaking machine.

The third issue raised, i.e., whether the trial court erred in submitting the defendant's liability for failure to warn of an obvious danger to the jury, has merit and warrants a new trial upon scrutiny of the facts against the applicable case law.

■ In Pennsylvania, liability for failure to warn exists where the lack of a warning is "unreasonably dangerous and the proximate cause of the accident." *Greiner v. Volkswagenwerk Aktiengeselleschaft*, 540 F.2d 85, 96–97 (3rd Cir.1976). The absence of either factor of "unreasonably dangerous" or "proximate cause" is fatal to a plaintiff's cause of action when premised upon a failure-to-warn assertion. See *Davis v. R.H. Dwyer Industries, Inc.*, 548 F.Supp. 667, 670 (E.D.Pa.1982); cf. *Berkebile*, supra, 462 Pa. at 100, 337 A.2d at 902 ("If the product is defective absent ... warnings, and the defect is a proximate cause of the plaintiff's injury, the seller is strictly liable without proof of negligence."); *Fraust v. Swift and Co.*, 610 F.Supp. 711, 713 (W.D.Pa.1985) (semble).

■ Additionally, where the theory of liability is failure to warn adequately, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning may have prevented the accident before the issue of causation may be submitted to the jury. *Conti v. Ford Motor Co.*, 743 F.2d 195, 198 (3rd Cir.1984), cert. denied, 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 784 (1985).

At bar, only a caution tag was purportedly attached to the top of the motor housing of the dust collector. It read:

Caution. Removal of any parts or accessories from this unit is in violation of current federal and local safety and health laws. Manufacturer is not responsible if any alterations are made to this equipment.

Staymates testified that no other literature was received by him as to the operation or maintenance of the unit in question.

As to the circumstances surrounding the accident and the mental thought processes of the victim during that time, the record discloses that when the bag was blown from the exhaust port of the dust collector and landed at Staymates' feet, he "just instinctively grabbed the bag". He stated further that he "reacted immediately" and had no time to consider his options. He did not stop to "think" about where the "off-on" switch was located.

■ The type of instinctive, knee-jerk reaction exhibited by the plaintiff would not, we believe, have been preventable by the attachment of a warning label that, in the words of the plaintiff's expert, would "alert" the user of the product to the potential danger associated with the equipment.

In *Conti*, the "momentary inadvertence" of the driver of a vehicle to disengage the clutch caused it to move and knock the victim over as she was attempting to enter the vehicle at the moment it lurched backwards.

The Third Circuit, in reversing and remanding for entry of judgment for the manufacturer for the District Court's instructing the jury on a "failure to warn" in the products liability case, stated in *Conti:*

> *We find the evidence insufficient as a matter of law to support a reasonable inference that the existence of additional warnings may have prevented the accident from occurring.* There is absolutely no evidence in the record to suggest that Mr. Conti would have paid any greater attention to what he was doing when starting the car if additional warnings were contained in Ford's operator manual, or even if a sticker reminding the operator to disengage the clutch before starting the car in gear was prominently displayed in the interior of the car. Rather, the jury's conclusion was based on the mere speculation that if Mr. Conti's eyes had caught a sticker warning him to depress the clutch pedal as he was talking to his wife,

he may have remembered to either shift the car to neutral or to disengage the clutch prior to starting the car. Ford cannot be held liable on a failure-to-warn theory merely because a jury concludes that more warnings are needed to remind drivers of the intricacies of standard transmissions. Rather, liability may result only when there is sufficient evidence that additional warnings or reminders may have made a difference. *See. e.g., Sherk v. Daisy-Heddon, A Division of Victor Comptometer Corporation,* 498 Pa. 594, 450 A.2d 615 (1982).

743 F.2d at 198–99 (Emphasis added).

Instantly, as in *Conti,* we fail to discern how a different or more prominently displayed warning label would have prevented Staymates from acting, using his own words at trial, without thinking and instinctively during the few seconds that elapsed between the retrieval of the cloth bag and the injury.

Neither the victim nor his expert witness proffered any evidence to substantiate a finding by the jury that had a different or additional warning or reminder been affixed to the exterior of the dust collector the outcome may have been averted. *Id.*

Therefore, because we cannot ascertain from the verdict whether the jury found as it did because of the absence of a "guard" over the discharge port (the lack of which rendered the product defective and the manufacturer strictly liable) or the "failure to warn" charge prompted them to reach a similar conclusion, we must reverse the judgment entered in favor of the plaintiff and remand for a new trial. See *Smith v. Chardak,* 291 Pa.Super. 173, 435 A.2d 624 (1981). The former would be a proper basis for the award, but the latter is not for the reasons stated supra. Accordingly, the course to pursue is a reversal and remand for a new trial. *Id.*

The remaining issues presented to this Court on behalf of the defendants [6] have been thoroughly analyzed and, albeit not given in depth discussion, have been found to be meritless.

Judgment reversed and case remanded for a new trial. Jurisdiction is relinquished.

CIRILLO, President Judge, concurs in the result.

---

**6.** The two remaining issues not discussed, but found to be wanting, are:

IV. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF SUBSEQUENT DESIGN CHANGES IN THE PRODUCT.
V. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW DEFENDANTS' EXPERT WITNESS TO OPINE ON AN "ULTIMATE ISSUE."

As to Point IV see *Matsko v. Harley Davidson Motor Co.,* 325 Pa.Super. 452, 473 A.2d 155 (1984); and for Point V see *Huck-Gerhardt Co. v. Kendall,* 189 Pa.Super. 126, 149 A.2d 169 (1959); Kleiner and Rome, Trial Handbook For Pennsylvania Lawyers § 276 (1980).