**Haines v. Raven Arms**

*Stephen T. Saltz*, for plaintiffs.
*Fredric Goldfein*, and *Leslie A. Miller*, for defendant.

KLEIN, *J.*, April 10, 1992—

## SUMMARY

This is an appeal by Donn's Inc., a gun shop, against whom a jury verdict was returned for negligently failing to give instructions when selling a handgun. Tamika Haines, then a teenager, was shot by Walter Butler, a friend. Butler had taken the bullet clip from a semi-automatic pistol and, thinking it unloaded, was playing with it. The gun discharged, striking Tamika in the head. As a result of her injury, she suffered major memory loss, loss of cognitive abilities, and has trouble walking and using her arms. Not only will she need constant care for the rest of her life, but she cannot carry on a conversation or have normal human relationships.

The jury found negligence on the part of Butler, Donn's Inc., and two other defendants. The jury apportioned responsibility as follows:

Walter Butler, the shooter—25 percent;

Brenda Teagle, the woman who stored the loaded gun with a bullet lodged in the chamber—40 percent;

Diane Teagle, who took out the gun and gave it to Butler—5 percent; and

Donn's Inc., the gun store the jury found supplied Brenda Teagle with the gun, without giving any written or oral instructions—30 percent.

In the damage phase of the case, the jury entered a verdict against all defendants for $3,350,802.60 for compensatory damages and $8 million for pain and suffering. The pain and suffering award was reduced on remittitur by the court en banc to $5 million. The total damage award entered by the court therefore was $8,350,802.60, and delay damages were added in the amount of $3,910,680.80, so the total molded verdict is $12,261,483.40, to which defendants are jointly and severally liable.

Some of the practical aspects of the case should be noted. Initially, target defendants included the manufacturer of the gun and the distributor of the gun. The theory was that there should have been a safety so the gun could not fire with the clip removed. Additionally, plaintiff sought recovery because the manufacturer failed to provide adequate warnings. The manufacturer and distributor settled for $950,000 before trial. Because of economic problems of the manufacturer, the distributor and one of the carriers, there was a risk that there could be a 402A products liability verdict against Donn's Inc., for which Donn's could not receive indemnity. Donn's refused to participate in a settlement in the range of the other two defendants despite urging from the court. Instead, Donn's decided to go to trial when the only issue would be negligence. At trial, no evidence was put on against the manufacturer and distributor by any party. It is clear that none of the remaining defendants, including Donn's Inc., have assets to satisfy anything but a nominal portion of the

judgment. Also, Aetna, the carrier for Donn's Inc., has paid its policy limits of $1 million plus delay damages on that amount. The underlying concern relates to future proceedings if this appeal is denied. Plaintiff will file a bad faith action against Aetna for failing to offer a reasonable settlement figure prior to trial.

At the trial, the testimony of Brenda Teagle, the owner of the gun, was that she was being harassed in her neighborhood and went to Donn's Inc., a gun shop, to buy an inexpensive gun. She testified that although Don Kinsey, the owner of Donn's, recommended the inexpensive semi-automatic gun to her, someone else gave her the gun when she came in to pick it up after the waiting period. She testified that she did not receive any oral instructions. Further, she said that the gun was not delivered in its box but instead in a revolver box, and therefore it contained no written instructions. Don Kinsey testified that he had no memory of Mrs. Teagle. He testified that it would not be proper practice to sell the gun to Mrs. Teagle without written instructions. If the instructions had been included, they would have stated that the gun should not be stored with a bullet in the chamber, since there was no mechanism to prevent the gun from firing with the clip removed. Therefore, a risk existed that someone could remove the clip and pull the trigger, thinking the gun empty. This is exactly what happened. The jury found that failure to provide this warning was negligence on the part of Donn's Inc., and although the shooting was years after the gun was sold, the lack of warnings resulted in improper loading and storage which resulted in the injury to Tamika Haines. The court en banc found that there was sufficient evidence to sustain this conclusion.

The three judge panel of the court en banc unanimously rejected the argument made by Donn's Inc. that the shooting was too remote from the sale for the lack of warnings to be a legal cause of the injury. The plaintiff had argued the instructions were designed to avoid precisely the kind of tragedy that occurred. The risk of storing the gun with a bullet in the chamber was that someone could remove the clip and play with the gun, erroneously thinking it was unloaded. The mere fact that the gun was stored for a long period of time without being used did not change the basic negligence and the fact that the accident would not have occurred absent the improper storage.

The court en banc also rejected defendants' claim that there was no evidence that Mr. Teagle would have followed warnings if given and defendants' claim that the court improperly allowed her to testify to that effect. Mrs. Teagle did testify that she looked for instructions, and only when finding none went to her neighbor for help in loading the gun. This does provide a factual background for the jury to conclude that she would have followed the instructions had they been given. It also provides the basis for her to testify that she would have made sure there was no bullet in the chamber when she stored the gun.

The jury awarded $8 million in pain and suffering, which was reduced to $5 million by the court en banc. This is always a difficult decision, particularly if made by a lay jury with no experience in such damage awards. The three experienced civil trial judges on the court en banc believed that while $8 million was excessive, $5 million was not excessive. Therefore, the award was reduced to $5 million.

Tamika Haines suffered catastrophic injuries, including major memory loss, loss of cognitive abilities, significant balance problems and trouble using her right arm. She knows she was once normal and although she has significantly reduced intellectual capacity, cannot relate to "retarded" people. At the same time, she is not in any physical pain and can carry out many tasks. In balancing these factors, the court reduced the $8 million pain and suffering award to $5 million.

The court en banc sustained the award of delay damages on the revised award. The case was tried at about the same time as other cases filed in November of 1984, so any delay did not affect the trial date. Defendant's argument that the case would have been tried sooner because it was assigned to an individual judge for discovery and motion purposes is incorrect both in the terms of the order assigning the case and the practice in Philadelphia. The court is entering an award on the total verdict, assessing each defendant its proportionate share of delay damages. The majority concludes that, since the defendants are jointly and severally liable, the plaintiff can collect all the delay damages as well as the total verdict against any defendant. In this case, it was known from the beginning that all defendants other than Donn's Inc. were unable to satisfy any significant judgment. The amount needed by Donn's Inc. to settle the case would have included the share of the other defendants, and therefore delay damages should be based on that amount.

## FACTS

On September 29, 1981, Brenda Teagle went to Donn's Gun Shop to buy an inexpensive gun. Her

decision to buy a weapon was based on neighborhood tensions and physical harassment of her daughter Diane by neighborhood youths. Mrs. Teagle was shown two small guns that were represented as weapons that a woman who was inexperienced with guns could manage. She choose the Raven Arms model P-25 handgun, filled out the required application forms and left a $30 deposit.

On October 23, 1981, Mrs. Teagle returned to Donn's to complete the transaction and take possession of the gun. During the trial Mrs. Teagle testified and the jury believed that someone other than Don waited on her that day, and that she left Donn's with the weapon and ammunition, but without the original box, without written instructions, and without receiving verbal instructions or warnings.

She discovered the lack of instructions when she arrived home. Because she was inexperienced and had received no oral or written instructions, she prevailed upon her neighbor, Mr. Ledbetter, to load the gun and prepare it to be ready to fire immediately. Mr. Ledbetter loaded the six-round clip, put a round in the chamber, and added another round to the clip. Mrs. Teagle then stored the gun in her dresser drawer.

For nearly two years, and throughout two changes in residence, the gun remained in Mrs. Teagle's dresser drawer, ready to fire. Admittedly, Mrs. Teagle knew nothing of the features of the Raven P-25, including that the gun had both a "safety" and "fire" position, and that the gun now housed an extra bullet in the chamber. However, she did instruct Diane, her adolescent daughter, not to ever touch or talk about the gun.

In mid-1983 the Teagles moved to 900 Spencer Street where Diane Teagle befriended Tamika Haines, a neighborhood youth. The two girls were together after school on September 2, 1983, at the Teagle apartment. They were joined by another neighborhood youth, Walter Butler. Their conversation turned to the events of the previous day, when Tamika had been attacked at knife point. Contrary to her mother's admonitions, Diane boasted that her mother kept a gun in the house, and to prove it, she went to her mother's dresser drawer and produced the weapon. Walter claimed he knew all about guns. He removed the clip and, believing that it was not loaded, pointed the gun at Tamika and pulled the trigger. The extra bullet that was housed in the chamber discharged and entered Tamika's head. After the police arrived she was rushed to the hospital for emergency surgery. Tamika spent weeks in the hospital and months in a rehabilitation center. To this day she remains brain damaged with a severely reduced mental capacity.

## ISSUES PRESENTED

Although counsel collectively filed over 135 pages of "briefs," the major issues fall into three categories. First, was there sufficient causation evidence to find Donn's Inc. liable, and were there any evidentiary errors relating to the causation issue? Second, was the remittitur proper, and not too much or too little? Third, were the delay damages properly assessed against Donn's Inc.?

## A. SUFFICIENT EVIDENCE

There was sufficient evidence to show that Donn's was negligent for failing to warn of the "hidden" danger

that the semi-automatic hand gun could fire with the clip out, and that this was the cause of the injury.

(1) *Donn's was negligent for not giving written or oral instructions to a woman Donn's knew never handled a gun before.*

It is difficult to see how one could say that a gun dealer can sell a gun to a woman who said she never used guns before without supplying oral or written instructions. In fact, the "Don" of "Donn's," Don Kinsey, testified that it was beneath the standard of the average gun dealer to deliver a gun without written instructions, and there was expert testimony that oral warnings should be given to an inexperienced gun buyer. The issue in this case was whether the failure to give warnings not to store the gun with a bullet in the chamber caused the injury.

Perhaps those skilled in the use of guns might think that it is "generally known" that a semi-automatic can fire even with the clip out, because a bullet might be in the chamber. Certainly, it is "generally known" that if you point a loaded gun at someone and pull the trigger, the other person will get shot. This is why guns and knives are not "defective" just because they can cause harm. Although most people are instructed not to play around even with unloaded guns, normally one thinks that if you take the bullets out of the gun, it will not fire. Here, Walter Butler *thought* he took the bullets out of the gun but in fact left one in the chamber. Such information is not so widely known that no warnings are needed.

This risk fits under the terms of Restatement (Second) of Torts, §388, comment (k). Donn's Inc. certainly

knew that guns, if properly stored or handled, pose a risk to innocent third parties such as Tamika Haines. Don Kinsey certainly knew that as an inexperienced gun owner, Brenda Teagle might not know that it is dangerous to store a gun with a bullet in the chamber. By failing to give oral or written warnings, Donn's Inc. failed to warn of the danger of improper storage, that is, storage with a bullet in the chamber. The risks were outlined by plaintiff's expert and generally supported by Don Kinsey and defendant's expert.

(2) *There is sufficient evidence for the jury to find that the failure to warn not to store the gun with a bullet in the chamber caused the injury.*

The warnings that Mrs. Teagle would have seen had she received the proper box and instructions would have included the following:

## "CAUTION

"For your safety, and that of others, we strongly recommend that you do not store, carry or handle this, or any other, firearm with a cartridge in the barrel until you are ready to shoot it. A cartridge from the magazine supply can be placed in the barrel, ready to shoot, in about the same length of time as required to move the safety slide from the safe ("S") to the fire ("F") position."

Had that caution been read and followed, the gun would have clicked harmlessly when Walter Butler pulled the trigger.

The time that passed made no difference—the risk came from improper storage. Someone could come across the gun at any time, and the situation would

be the same where the person might not know of the potentially dangerous situation. (Contrary to his professed knowledge of guns), certainly Walter Butler did not realize the danger of pointing the gun with the clip removed—a "latent danger" of this gun.

Moreover, according to the testimony, there was also evidence that Mrs. Teagle had the safety off, since she was mistaken on exactly where the safety was. Once again, that would have been covered by written or oral instructions.

Donn's Inc. argues that there is no evidence that would support a conclusion that Brenda Teagle would have followed the warning if given and stored the gun without a bullet in the chamber.

The law provides that when the theory is failure to instruct or warn, the evidence must support "a *reasonable inference,* rather than a guess, that the existence of an adequate warning *may have* prevented the accident." *Staymates v. ITT Holub Industries,* 364 Pa. Super. 37, 51, 527 A.2d 140, 147 (1987) (emphasis supplied); citing *Conti v. Ford Motor Co.,* 743 F.2d 195, 198 (3rd Cir. 1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed. 2d 784 (1985).

It can be inferred that Mrs. Teagle would have stored her gun in a safe manner. No reasonable jury could conclude that had she been warned of the danger of storing a gun with a bullet lodged in the chamber she would ignore it, particularly with a young daughter in her house. This is far different from the circumstances in *Staymates,* where the plaintiff made an instinctive action to go to a machine, or in *Conti,* where a driver disengaged the clutch of a car with a standard

transmission. These were both moments of inadvertence and it was only a guess that the warning would have prevented anything. Perhaps a jury could infer from seeing Brenda Teagle on the stand that she would not follow such a warning. However it is also reasonable for a jury to infer that she would do what a normal, sane person would do which is to follow the instruction; not taking the great risk that occurs when a gun is stored with a bullet in the chamber enabling it to fire with the clip removed. In fact, there was testimony, to which no objection was made, that she told her neighbor she wanted to have the gun on safety.

(3) *There was no reversible error in allowing Mrs. Teagle to say she would have followed the warnings if given.*

Defendant also complains because objections were overruled to some of the questions as to how Mrs. Teagle would have stored the gun had she been given proper warnings. These questions were certainly consistent with her factual testimony that she looked for instructions, and failing to find them, went next door to ask a neighbor how to load the gun and to ask for the gun to be put on safety. It flows logically, therefore, that she would have followed the instructions had they been given. Since she has stated the factual background, she can give her conclusions. The statements that she would have had the safety on and had no bullet in the chamber would be harmless error at best, since she already said she tried to obtain instructions on how to load the gun. In any event, after she testified to the basic facts, it was proper to allow her to state her conclusion. The federal court cases

cited as if they were binding authority are distinguishable, and if not, this court disagrees with them. For example, in *Messenger v. Bucyrus-Erie Co.*, 507 F.Supp. 41 (W.D. Pa. 1980), *affirmed* 672 F.2d 903 (1981), *cert. denied*, 455 U.S. 944 (1982), prior to testimony starting the court excluded the testimony of a man crushed by a truck backing up that he would have moved had he heard a warning. The holding in that case is that the testimony was proffered before the factual background was made, and therefore it was speculative and self-serving. It was indicated that had the testimony been offered after he testified and laid the groundwork of the factual situation, it would have been based on evidence of his perceptions and been admitted. Brenda Teagle's testimony was given only after substantial testimony showing how she tried to get information to load the gun properly.

## B. REMITTITUR WAS PROPER

The remittitur was proper and within the authority of the court.

Defendant Donn's filed a motion for remittitur stating that the pain and suffering award of $8 million was shocking and without justifiable basis. By special interrogatories, the pain and suffering figure was stated separately from the award of $3,350,802.60 for medical expenses, loss of earnings and care and supervision. Defendant's motion was granted and the award was reduced by the en banc panel to $5 million. Plaintiff complains that there should be no remittitur and defendant says it was not sufficient.

As noted, Tamika Haines suffered catastrophic injuries. In essence, she has been deprived of the ability to have normal relationships with other human beings. She suffered major memory loss, loss of cognitive abilities, and has trouble walking and using her arms. She had seven major surgeries. She cannot be left alone for long, for fear that she will wander off and be taken advantage of by anyone who comes along. At the same time, she remembers that she was once normal and has difficulty relating to those who she considers "retarded." Clearly, this warrants a significant award.

On the other hand, she is not in any physical pain, does relate to her family, goes by herself to remedial classes, and can carry out some activities. She is not in the same class as someone who is a quadriplegic or in great constant pain that cannot be treated.

Precisely because this is not a cut-and-dry issue, the trial court asked for a court en banc to consider this issue. Three very experienced civil trial judges including the trial judge (who saw all the witnesses and heard all the facts in detail) heard the motions. While the consensus was that $8 million was excessive considering this case in light of other kinds of catastrophic injuries, the consensus also was that $5 million was not excessive. Certainly there is no magic in setting a figure of $5 million instead of $8 million. However, it is asking a great deal of a lay jury to fix a figure in a case like this with no experience and precious little guidance. At least the three judges have a long background from which to draw when determining what is excessive and what is not excessive. We believed that the jury figure of $8 million was excessive and should be modified. Accordingly, we reduced the pain

and suffering award to an amount that we thought to be proper considering her catastrophic injuries.

Technically, there are six factors to be considered by the court in determining whether a jury's damage verdict is excessive: (1) the severity of the injury; (2) whether plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the plaintiff; (3) whether the injury will affect the plaintiff permanently; (4) whether the plaintiff can continue with his or her employment; (5) the size of plaintiff's out-of-pocket expenses and (6) the amount plaintiff demanded in the original complaint. *Stoughton v. Kinzey,* 299 Pa. Super. 499, 503, 445 A.2d 1240, 1242 (1982); *Kemp v. Phila. Trans. Co.,* 239 Pa. Super. 379, 361 A.2d 362 (1976). Obviously, there are significant physical and emotional damages, and considerable out of pocket expenses. The demand is only partially relevant because it was tempered by questions as to liability. However, *Kemp* provides only limited help in dealing with the specifics of this case. As the *Kemp* court itself points out, it is difficult to compare the facts of different cases "because each case is unique and dependent on its own special circumstances." *Kemp* at 382, 361 A.2d at 364.

It is the responsibility of the judiciary to keep pain and suffering awards within reasonable bounds in a case such as this where the jury cannot help but have sympathy for the plight of the plaintiff. *Daley v. J. Wanamaker,* 317 Pa. Super. 348, 352-53, 464 A.2d 355, 357-358 (1983). Certainly, some figure goes beyond the reasonable in any case. By agreement of the en banc panel of judges, it was determined that $8 million

was excessive, and that $5 million was not an excessive award for her pain and suffering.

## C. DELAY DAMAGES PROPERLY AWARDED

Delay damages are properly awarded for the entire time period on the amount of the verdict.

The court en banc sustained the award of delay damages on the revised award.

There was no question as to the computation. The total, 46.83 percent, was due on the period from November 7, 1984, the date suit was filed, until May 22, 1989, the day of the damage verdict. The reduced verdict was $3,350,802.60 for tangible damages and $5 million for pain and suffering, for a total of $8,350,802.60. The calculation of 46.83 percent of this sum is $3,910,680.80, for a total molded verdict of $12,261,483.40.

(1) *The case was tried at the same time other cases filed at the same time were tried.*

The case was tried about the same time as other cases filed in November of 1984, so any delay did not affect the trial date. Defendant argues that the case would have been tried sooner because it was assigned to an individual judge for discovery and motion purposes. That is incorrect.

The order of February 8, 1985, of then President Judge Edward J. Bradley assigned the case to Judge Richard B. Klein "for all pre-trial, trial and post-trial matters." By its terms, the order specifically said, "This assignment does not constitute an order for a special or accelerated trial listing." Judges are admonished not to treat these listings as a reason to "jump" over

cases filed earlier for trial purposes. Accordingly the case was tried in its normal course, albeit the delay is much too great because of the backlog. The case came to trial at the same time other cases filed in late 1984 were reaching the top of the trial list. Therefore, any delays did not affect the trial date. See *Tindal v. SEPTA*, 385 Pa. Super. 94, 105, 560 A.2d 183, 189 (1989).

(2) *Any delay was not occasioned by plaintiff, but resulted from discovery difficulties with financially troubled defendants.*

The log and correspondence supplied with plaintiff's answer to new matter responding to plaintiff's motion pursuant to Pa.R.C.P. 238 shows the typical back-and-forth of discovery. It was complicated by the receivership of Mission Insurance Company, the carrier for the manufacturer, Raven Arms; and the bankruptcy of Eastern Shooters, the distributor. While plaintiff was delayed in filing an expert report, she could not file an expert report until much of the discovery of the defendants had been completed. Donn's Inc. has not demonstrated that the delay was occasioned by plaintiff.

(3) *Delay damages are not reduced by payments from other defendants not found to be tortfeasors.*

Donn's Inc. claims that there should be a reduction in delay damages because $950,000 was received by plaintiff from Raven Arms, the manufacturer, and Eastern Shooters, the distributor. This theory is not supported by any Pennsylvania law. There may be a reduction in a non-settling defendant's liability if a plaintiff settles with someone else later found to be a tortfeasor. However, unless there is a finding that the settled party

is a tortfeasor, there is no reduction. The Uniform Contribution Among Tort-feasors Act, 42 Pa.C.S. §§8321-8327, only provides for contribution among *tortfeasors*. If not found to be a joint tortfeasor, the party making the payment is considered a "volunteer" and there is no reduction in the non-settling defendant's share. While this policy has been criticized, it is the law of Pennsylvania. *David v. Miller,* 385 Pa. 348, 123 A.2d 422 (1956); see also, *Stone & Webster Eng. v. Heyl & Patterson Inc.,* 261 Pa. Super. 150, 395 A.2d 1359 (1978); *Rocco v. Johns Manville Corp.,* 757 F.2d 110, 118 (3rd Cir. 1984). After trial, it was determined that Raven Arms and Eastern Shooters were *not* liable. They were not considered tortfeasors and therefore there is no reduction. Since they have no share, there can be no delay damages assessed against them.

(4) *Plaintiff can collect the entire judgment, including delay damages on the full judgment, against any defendant found liable.*

Pennsylvania law provides that since there is joint and several liability, a plaintiff can collect the full amount of a verdict from any defendant, and then let that defendant seek contribution from the other defendants. Recent case law has made it clear that she can collect not only the judgment amount of the other defendants from Donn's Inc., but also can collect the delay damage share of the other defendants. *Tindal v. SEPTA,* 385 Pa. Super. 94, 560 A.2d 183 (1989); *Wirth v. Miller,* 398 Pa. Super. 244, 580 A.2d 1154 (1990).

Donn's Inc. claimed that while a plaintiff can collect the total verdict amount from any one defendant, the

share of a defendant for delay damages can only be collected from that defendant. This has been rejected by the Superior Court, which ruled that there is joint and several liability for delay damages.

In *Tindal v. SEPTA,* 385 Pa. Super. 94, 105, 560 A.2d 183, 189 (1989), an en banc decision of the Superior Court pointed out that under the language of Rule 238, damages for delay become part of the verdict. Pa.R.C.P. 238(a)(1). Delay damages are in the nature of pre-judgment issue, and appropriately are part of the award. This position was quoted and followed in *Wirth v. Miller,* 398 Pa. Super. 244, 252-53, 580 A.2d 1154, 1158-59 (1990).

Technically, the court is apportioning delay damages against each defendant's share at this time. The jury assessed the proportionate shares of liability of each of the defendants. (This, of course, excludes the manufacturer and distributor, since no evidence was presented against them.) The liability of Donn's Inc. for delay damages on its share was discussed above. None of the other defendants made any significant offer. This court therefore allocates delay damages based on the total verdict in the same percentage the jury fixed responsibility: 40 percent against Brenda Teagle, 30 percent against Donn's Inc.; 25 percent against Walter Butler, and 5 percent against Diane Teagle.

Plaintiff can collect the total verdict plus delay damages from all shares against Donn's Inc. Donn's Inc., of course, will have the legal right to seek contribution from the other defendants for anything it pays beyond its proportionate share, be it the verdict amount or delay damages.

We note that there are cases that provide that non-settled defendants are not responsible for delay damages on the shares of settled defendants. However, these cases do not require the conclusion that a plaintiff cannot collect from any non-settled defendants delay damages on the shares of all non-settled defendants. In fact, the rationale behind these cases supports the view of full joint and several liability, including liability for delay damages.

*Hughes v. GAF Corp.*, 364 Pa. Super. 311, 528 A.2d 573 (1987), held that delay damages should be calculated on the molded portion of the verdict only. Quoting *Korn v. Consolidated Rail System*, 355 Pa. Super. 170, 174, 512 A.2d 1266, 1268 (1986), the court said it was "unrealistic to require each defendant to offer nearly the full amount of damages ultimately recovered in an action where the amount finally attributed to each defendant is only a percentage of the total." Again quoting *Korn*, the court said "it would be anomalous to award a plaintiff delay damages on money already received from the settling defendants."

In *Walton v. Avco*, 383 Pa. Super. 518, 557 A.2d 372 (1989), the Superior Court cited *Hughes* and *Korn* for the proposition that after one defendant has settled, the plaintiff and the non-settling defendant should not negotiate based on the full amount of the verdict, but only the amount left after deducting the settled defendants' shares.

It is realistic to impose joint and several liability for delay damages as well as the underlying verdict in this case. It is known and was known from the beginning that all defendants other than Donn's Inc.

are unable to satisfy any significant judgment. They are uninsured and, in essence, are judgment proof. Therefore, it would have been unrealistic to expect Donn's Inc. to settle based only on its share. The plaintiff would look to Donn's Inc. for payment of any verdict shares assessed against Butler and the Teagles. Therefore, to settle the case, the plaintiff would also look to Donn's Inc. for any settlement to be made based on the full verdict potential. Therefore, it is equitable to impose upon them delay damages upon the full verdict. This is very different from the situation where the other defendants have paid and the non-settling defendant would only be liable for a pro-rata share.

The purpose of Rule 238 is primarily to encourage settlements. *Landenberger v. Port Authority,* 496 Pa. 52, 59, 436 A.2d 147, 151 (1981). When there is only one solvent tortfeasor, that defendant has to offer the full value to settle the case or risk paying the whole judgment. Therefore, it is appropriate to assess delay damages on the full amount that defendant should have paid to settle the case.

Under the theory of joint and several liability, it then becomes the task of the tortfeasor to collect from the other tortfeasors. There is no reason to treat delay damages differently from other damages for the purposes of joint and several liability.

Accordingly, the injuries are reasonably connected to the negligence, there were no trial errors requiring reversal, the remittitur was proper, and the delay damages were properly assessed.