## Diggs v. M&J Painting & Wallcovering Inc.

C.P. of Dauphin County, no. 22 S 1993.

*Archie V. Diveglia,* for plaintiffs.

*Donald H. Carlson, John R. Pendegrast Jr.* and *Donald M. Lewis III,* for defendant ChemRex Inc.

*EN BANC,* TURGEON, HOOVER AND CLARK, *JJ.*

TURGEON, *J.,* September 17, 1996—On January 5, 1993, plaintiffs Victor and Anna Diggs filed a complaint against defendants M&J Painting & Wallcovering and ChemRex Inc. Plaintiffs seek damages against ChemRex on a theory of products liability. The defendants subsequently joined Federal International Chemicals/Valspar Corporation and Lord Corporation (both manufacturers), J.C. Budding (distributor), Ritter Brothers (general contractor), and Holy Spirit Hospital. All parties, including M&J Painting, have since settled except ChemRex, which has filed a motion for summary judgment. Oral argument on this motion was held before an *en banc* panel of this court on May 23, 1996. For the reasons set forth below, ChemRex's motion is denied.

## FACTS

At approximately 7:20 a.m. on October 2, 1991, two employees of M&J Painting began spraying a concrete sealant in the basement of a new addition to the Holy Spirit Hospital in Camp Hill, Pennsylvania. Both employees were wearing respirator protection. Unbeknownst to the M&J employees and their project manager, James Lawrence, plaintiff Victor Diggs had begun work in the basement at approximately 8 a.m., installing a medical records dumbwaiter in a stairwell for his employer, General Elevator Company. It is alleged that plaintiff inhaled fumes from the sealant and by 9:30 a.m., became ill. Plaintiff was ultimately hospitalized and diagnosed with toxic hepatitis and toxic

encephalopathy. Defendant ChemRex was the distributor of the sealant, which was sold under the label Sonothane. On the date of the accident, Lawrence had delivered four five-gallon cans of Sonothane to the worksite. ChemRex designs warning labels for Sonothane. The cans contained two different labels. An April 1989 label contained the following warning:

*"WARNING*

HARMFUL OR FATAL IF SWALLOWED.

VAPOR HARMFUL

See warnings elsewhere on label.

FOR PROFESSIONAL USE ONLY"

The additional warnings on the April 1989 label state, "DANGER FLAMMABLE, use only with adequate ventilation, reseal partially used containers, store away from sources of ignition and keep out of the reach of children." The label recommended certain safety equipment—"Use of impervious gloves, goggles and if applied in areas of poor or inadequate ventilation, use NIOSH/MSHA approved organic vapor respirator." Furthermore, the label indicated Sonothane could be applied by brush, spray or lamb's wool applicator. The label also provided as follows:

"May cause injury to skin or eyes following repeated or prolonged contact. Prevent contact with skin and eyes. If contact occurs, flush affected area(s) thoroughly with plenty of water. Remove and wash contaminated clothing before reuse. May cause respiratory irritation and intoxication with central nervous system depression. Repeated overexposure may cause central nervous system or kidney damage. If inhaled, remove to fresh air.

If breathing is difficult, give oxygen. If not breathing, administer artificial respiration. May cause irritation or injury to liver or kidneys if ingested. DO NOT take internally. If ingested, DO NOT induce vomiting. Liquid aspirated into lungs may cause serious lung injury. Give water or milk if victim is conscious and not drowsy. This product contains TDI which has been determined to be carcinogenic by the National Toxicology Program in a laboratory animal feeding study. The International Agency for Research on Cancer reviewed the same study and concluded that the evidence was inadequate to classify TDI as human carcinogen. SEEK MEDICAL ATTENTION FOR ALL OVEREXPOSURES."

A June 1991 label provided the following warning:

*"WARNING*

*DANGER—COMBUSTIBLE*

See warnings elsewhere on label.

FOR PROFESSIONAL USE ONLY"

The additional warnings on the June 1991 label provided: "WARNING DANGER—COMBUSTIBLE, use only with adequate ventilation, reseal partially used containers, store away from sources of ignition, keep all used and unused containers out of the reach of children and seek medical attention for all overexposures." This label recommended personal protective equipment: "Impervious gloves, goggles, and, if used in areas of poor or inadequate ventilation, use NIOSH approved organic vapor cartridge respirator in accordance with 29 CFR 1910.130. Refer to Material Safety Data Sheet for further recommendations." Furthermore, Sonothane was to be applied by lamb's wool applicator. No mention was

made that application could be by spray. In addition, the label provided as follows:

"May cause injury to skin or eyes following repeated or prolonged contact. Prevent contact with skin and eyes. If contact occurs, flush affected areas thoroughly with plenty of water. Remove and wash contaminated clothing before reuse.

"May cause respiratory irritation and intoxication with possible central nervous system depression. Repeated overexposure may cause central nervous system or kidney damage. If inhaled, remove to fresh air. If breathing is difficult give oxygen. If not breathing, administer artificial respiration. May cause irritation or injury to liver or kidneys if ingested. DO NOT take internally. If ingested, DO NOT induce vomiting. Liquid aspirated into lungs may cause serious lung injury. Give water or milk if victim is conscious and not drowsy.

"This product contains less than 1 percent of toluene diisocyanate (TDI) which has been determined to be carcinogenic by the National Toxicology Program in laboratory animal feeding study. The International Agency for Research on Cancer reviewed the same study and concluded that the evidence was inadequate to classify TDI as human carcinogen." (Pendegrast affidavit, exhibits C and D.)

The Material Safety Data Sheet (MSDS) provided by ChemRex for Sonothane and referred to in the June 1991 label was not provided to M&J Painting. (Lawrence N.T. 14; M. Van Wagner N.T. 168; W. Van Wagner N.T. 12.)

Plaintiff's labeling expert, E. Patrick McGuire, stated the ingredients within Sonothane would likely produce significant hepatic and neurological insults to workers unprotected with respiratory apparatus and that such damage could occur within a relatively short time period.

He noted that use of spray application, as opposed to roller application, would produce a greater vapor concentration, that vapors would settle in low-lying areas and that an exhaust ventilation system was a necessity in areas where the product was being applied. He concluded the labels were defective for failing to indicate what constituted "adequate ventilation," leaving the decision up to applicators who will likely be unable to determine what is adequate; that overexposure *will* cause target organ damage instead of *may* cause such damage; that damages to the central nervous system and hepatic system are irreversible and permanent; and that non-applicator personnel should be evacuated from areas where Sonothane might be concentrated. (Diveglia affidavit, exhibit 4.)

Catherine Griffith, a ChemRex employee who developed the "warning" portion of the label, agreed spraying increases the vaporization and that the product may accumulate and travel to a lower level. (Griffith N.T. 71-71, 124.) She also stated that the label warning did not address a particular application situation. (N.T. 40.) Her successor, Mark Horton, stated that toxicity depends upon how a product is used, where it is used, the proximity and the amount used. (Horton N.T. 50-51.)

William L. Cressler was the superintendent for the general contractor who was in charge of job safety for all trades at the worksite. (Cressler N.T. 24.) He stated that, in his experience, it is standard procedure for a subcontractor to contact the job superintendent and inform him if a potentially hazardous substance will be used. (N.T. 69.) He testified that before the sealant was applied to the basement floor, he notified the "hospital people" to stay out of the basement area on October 2, 1991, and that had he known of plaintiff's presence, he would have instructed him to also stay

away. (N.T. 165.) However, he did not have any knowledge that the Sonothane vapors could be harmful. (N.T. 35, 66.) Cressler admitted he undertook no steps to determine whether there was a health hazard for the applicators or to others from use of the product including reading the labels on the Sonothane cans or attempting to consult the MSDS sheets. (N.T. 141.)

James Lawrence, M&J Painting's project manager, stated that he and Cressler set up the schedule so that M&J Painting would be the only trade in the basement on the day of the spraying. (Lawrence N.T. 20, 49, 51.) It was his assumption that Cressler would take care of this and provide fans to remove vapors from the area. (N.T. 55, 116.) On the morning of the application, both he and the two M&J employees posted handwritten signs throughout the work area indicating "wet paint" and that open flames should not be used. (McBride N.T. 33-35.) Lawrence testified that the signs posted by his company made no reference to warning people away unless they were wearing respirators because he didn't think such warnings were necessary, and because he and Cressler had scheduled the work to occur when no other trades would be in the basement area. (Lawrence N.T. 92.) On the morning of the spraying he made an inspection of the area to make sure the area was prepared. (N.T. 52.) During his inspection, he did not see anybody, but had he, he would have told them to clear out of the area. (N.T. 52.) He did not know plaintiff and a co-worker were in the area when the spraying was occurring. (N.T. 50, 92.)

Prior to application, Lawrence testified he read the label to determine whether there was a health hazard to persons other than applicators. (N.T. 14.) It is generally his habit to look on labels of products to determine what can happen if proper ventilation does not occur.

(N.T. 35.) Initially at his deposition, Lawrence stated that he did not associate any health hazard to Sonothane vapors except flammability. (N.T. 65.) Later in his testimony, however, he stated that he was aware of serious dangers which could arise from breathing Sonothane vapors for a prolonged period of time and that he understood adequate ventilation was required not only because of flammability, but because breathing the vapors was potentially harmful. (N.T. 115-17.) He testified that he was unfamiliar with requirements for ventilating substances designated as hazardous by OSHA, and unfamiliar with the required use of respirators for products that contained hazardous substances. (N.T. 37.) He believed adequate ventilation to be any type of air movement that would remove vapors from the area. (N.T. 65.)

When asked whether he would have done anything differently had he read the labels, indicating the vapors could potentially cause damage to the brain, central nervous system, liver or kidney, Lawrence responded, "I don't think so." (N.T. 118.) When asked whether reading the MSDS sheet on Sonothane prior to its use would have altered his behavior, he responded that he might have had the men wear certain gloves or maybe eye protection. (N.T. 135-36.)

Randy McBride, one of two M&J employees who sprayed the Sonothane, indicated that he did not inform anyone verbally of the use or effects of the product. (McBride N.T. 33.) Having never worked with Sonothane before, he read the label on one of the cans just prior to application to find out how to clean up and whether a respirator was needed. (N.T. 38.) He stated that he had informed Cressler that he would be using Sonothane and assumed Cressler would contact the other contractors, although he did not inform him that the

vapors were harmful. (N.T. 39-40, 90-91.) Cressler told him that he would make sure that there was nobody else in the area while the spraying was taking place since "people can't be walking over wet floors." (N.T. 39.) While spraying was going on, he did notice hospital employees and one construction worker (not the plaintiff) in the area. (N.T. 47, 90-91.) He stated the hospital employees were using the stairwell in which plaintiff was located. (N.T. 117, 118.) When asked whether he would have altered his behavior had he read the label in its entirety, including warnings that inhalation could cause serious injury or brain damage, he indicated "[n]o, I would have done everything the same." (N.T. 73.) He admitted he knew that breathing the fumes could be harmful and that his response to the harm was to use a respirator and to make arrangements for other people to stay out of the area. (N.T. 73, 75.)

## DISCUSSION

Plaintiffs have alleged that ChemRex is strictly liable to them pursuant to section 402A of the Restatement (Second) of Torts, for distributing a product which was defective due to its lack of adequate labeling. Specifically, it is alleged that both the warning labels on the containers and literature sent to purchasers of the product failed to apprise users of the serious respiratory, neurological, and other health risks that vapors from the product could cause to both users and to bystanders who may be forseeably in and about the area of application without respiratory protection. (Complaint ¶40(b)-(d).)

Strict liability allows a plaintiff to recover against the manufacturer or seller of a product "where a product in 'a defective condition unreasonably dangerous to the user or consumer' causes harm to the plaintiff."

*Phillips v. A-Best Products Co.*, 542 Pa. 124, 131, 665 A.2d 1167, 1170 (1995) (citing section 402A, Restatement (Second) of Torts). "It is well settled a dangerous product can be considered 'defective' for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Mackowick v. Westinghouse Electric Corp.*, 525 Pa. 52, 56, 575 A.2d 100, 102 (1990). (citations omitted) A plaintiff raising a failure-to-warn claim must establish "that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury. . . . To establish that the product was defective, the plaintiff must show that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product 'unreasonably dangerous.' For the plaintiff in a failure-to-warn claim to establish the second element, causation, the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller." *Phillips v. A-Best Products, supra* at 131, 665 A.2d at 1171. (citations omitted)

### Duty To Warn Bystanders

Defendant first argues that it is entitled to judgment as a matter of law since, under section 402A, it did not owe a duty to warn the plaintiff, a bystander, of dangers from Sonothane. Instead, it owed a duty only to M&J Painting, the "user or consumer" of the product. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 100, 337 A.2d 893, 902-903 (1975) ("A seller must give such warnings and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of his product.") Furthermore, even if it had a duty to warn non-users, defendant argues the

warnings contained on the Sonothane labels were adequate as a matter of law.

A motion for summary judgment is appropriate when a review of all "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.C.P. 1035(b), 42 Pa.C.S. An entry of summary judgment may be granted only in cases where the right is clear and free from doubt. In ruling on such a motion, the record must be viewed in a light most favorable to the nonmoving party. *Demmler v. SmithKline Beecham Corp.,* 448 Pa. Super. 425, 430, 671 A.2d 1151, 1153 (1996). (citations omitted)

Under section 402A, as adopted by Pennsylvania, strict liability protects a "user or consumer" of defective products. *Webb v. Zern,* 422 Pa. 424, 427, 220 A.2d 853, 854 (1966) (quoting Restatement (Second) of Torts §402A(1)). As defined in the Restatement, plaintiff here was neither a user nor a consumer of Sonothane. See Restatement (Second) of Torts §402A cmt. 1. However, it appears that as in many jurisdictions, the courts in Pennsylvania have extended the protections afforded under section 402A to bystanders. See *Pegg v. General Motors Corp.,* 258 Pa. Super. 59, 69, 391 A.2d 1074, 1079 (1978) (holding that a passenger in a vehicle who was injured when a pool chemical placed in back seat by driver combusted, stated a cause of action in strict liability against manufacturer). See also, *Herman v. Welland Chemical Company,* 580 F. Supp. 823, 829 (M.D. Pa. 1984); *Eyer v. Bethlehem Millwork Inc.,* 40 Northamp. Cty. Rep. 228, 232 (1971) (both explicitly holding section 402A extends to innocent bystanders where the injury to the bystander was reasonably fore-

seeable), and 33 A.L.R. 3d 415 "Products liability: Extension of strict liability in tort to permit recovery by a third person who was neither a purchaser nor a user of product."

Three types of defective conditions can give rise to a strict liability claim: a design defect, a manufacturing defect and a failure to warn defect. *Phillips v. A-Best Products, supra* at 131, 665 A.2d at 1170. Where a manufacturing or design defect is alleged, extending protection to non-users and non-consumers creates no problems from the standpoint of the seller since the duty for placing non-defective products into the stream of commerce is the same for everyone. However, where strict liability is premised upon failure to warn, the issue becomes clouded wherein it must be determined what duty to warn, if any, a manufacturer or seller owes to non-users or non-consumers.

Indeed, the plaintiff does not contend that defendant should have produced a label to warn bystanders directly. Rather, plaintiff argues the label should have provided warnings not only to applicators of the product, but should have also defined and warned of dangers to bystanders who were without proper respiratory protection and directed applicators to give notice to third parties of such dangers. Defendant does not dispute that the labels did not warn applicators of dangers to non-applicator personnel.

Our research reveals that the issue of what duty to warn a manufacturer or seller of a product owes to a non-user or non-consumer has not been addressed by the appellate courts in Pennsylvania. Accordingly, as a matter of law, since it is unclear that defendant did not owe a duty to warn bystanders, vis-à-vis the ultimate users, of dangers Sonothane vapors could cause, summary judgment must be denied.

Defendant also argues that assuming it owed a duty to warn bystanders, the warning labels on the Sonothane cans were adequate. Defendant contends that the labels informed users of the product to avoid dangerous vapors and thus, the ultimate user knew or should have known of the obvious danger such vapors could cause bystanders. Initially, we note that "determinations of whether a warning is adequate and whether a product is 'defective' due to inadequate warnings are questions of law to be answered by the trial judge." *Mackowick v. Westinghouse Electric Corp., supra* at 56, 575 A.2d at 102.

Product warnings "must be directed to the understanding of the intended user. . . . The duty to adequately warn does not require the manufacturer to educate a neophyte in the principles of the product. A warning of inherent dangers is sufficient if it adequately notifies the intended user of the *unobvious* dangers inherent in the product." *Id.* (emphasis in original) (citations omitted) We disagree, however, that as a matter of law, the labels in question were adequate to inform the users of unobvious, foreseeable dangers which might occur to bystanders.

With regard to warnings regarding inhalation of Sonothane, the labels stated that adequate ventilation was required and that respirators were to be used in areas of poor ventilation. The label did not define in any way what constituted adequate ventilation, nor stress the increased vapor danger when spraying was used versus other methods of application. Furthermore, according to plaintiff's expert, the warnings should have indicated that the entire application area be evacuated and that an exhaust system was a necessity. With regard to the specific health dangers associated with the use of Sonothane, the labels indicated that the product *"may*

cause respiratory irritation and intoxication with central nervous system depression" and that "repeated overexposure *may* cause central nervous system or kidney damage." The label did not discuss acute exposure situations, which occurred here. Furthermore, according to plaintiff's expert, the warnings should have indicated that exposure *will* cause the harm indicated and that the label should have warned that exposure to the central nervous system and hepatic system is irreversible and permanent.

Thus, based upon these alleged deficiencies in the warning labels, we cannot conclude as a matter of law that the warning labels were adequate.

### Causation

Defendant next argues that summary judgment is appropriate since, even assuming it had an affirmative duty to include a warning to the ultimate user for the benefit of bystanders, the failure to do so was not the legal cause of plaintiff's injuries since the testimony reveals that the product applicators would not have altered their behavior in any way.

As noted above, to establish causation in a failure-to-warn claim, "the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller." *Phillips v. A-Best Products, supra* at 131, 665 A.2d at 1171. (citations omitted) Stated another way, plaintiff must establish "that had defendant issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided." *Demmler v. SmithKline Beecham Corp., supra* at 434, 671 A.2d at 1155. "[T]he evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning may have

prevented the accident before the issue of causation may be submitted to the jury." *Staymates v. ITT Holub Industries,* 364 Pa. Super. 37, 51, 527 A.2d 140, 147 (1987).

Specifically, defendant notes that the "learned intermediary" would not have altered its behavior since (1) plaintiff's presence was unknown, (2) the job was scheduled for a time when no one was to be present in the basement area, (3) no one paid attention to the labels when no one was to be present in the basement area, (4) no one paid attention to the labels and (5) M&J Painting project manager Lawrence testified that he would not have altered his behavior had the labels warned that vapors were dangerous. We disagree, however, that the testimony is unequivocal that adequate labels would have had no effect upon the actions of the parties involved to warn bystanders of the hazard of Sonothane vapors and that summary judgment must therefore be denied.

First, while plaintiff's presence was unknown, he might not have been present at all had the labels adequately defined the danger of sprayed Sonothane vapors to bystanders. Lawrence testified it was his habit to read product labels and that he did indeed read a Sonothane can label to determine if there was a health hazard to *non-applicator* personnel. His testimony initially indicated he did not associate a health hazard with Sonothane beyond flammability. Later he testified he understood of such a hazard from *prolonged* exposure to vapors. Had he read information on the labels which plaintiffs assert should have been included, he might have had a greater appreciation of the dangers sprayed vapors can cause to bystanders and altered his behavior with regard to impressing upon Cressler the precise reason for the need to have non-applicator personnel

removed from the area on the date of application. As it was, Cressler seemed most impressed that the floors would be wet and that the odor might bother hospital personnel. Furthermore, the signs posted by Lawrence and his two employees might have stressed the danger of breathing chemical vapors. Instead, the signs indicated only that floors would be wet, and open flames should not be used.

Defendant also notes that had plaintiff's presence been known, he would have been warned to leave. We disagree that this conclusion is warranted wherein at least two other hospital personnel and one construction worker were in the area during the spraying and neither were warned to evacuate.

Second, although both Lawrence and McBride testified at their depositions that nothing was scheduled in the basement area on the day of spraying, the testimony of Cressler indicates only that he informed "hospital people" to stay out of the basement. Again, had the Sonothane cans been provided with adequate labeling which included warnings on the danger of acute exposure from sprayed vapors, the risk of certain injuries from inhaling such vapors, the need for evacuating the area and the necessity of an exhaust system, Lawrence may have adequately impressed upon Cressler the danger involved. Thus, Cressler and Lawrence may have been more diligent in keeping the area clear.

Third, while the testimony indicates employee McBride did not pay attention to the labels, Lawrence indicated he was in the habit of reading labels and did so in this instance. This is significant in this case since he took charge of informing Cressler that the application was going to occur.

Finally, defendant maintains that Lawrence testified that had the labels warned that vapors were dangerous,

he would not have altered his behavior in retrospect. Lawrence's actual testimony was that he did not think he would have done anything differently. This response is not sufficient to conclude that he would not have altered his behavior particularly since he was not asked this question in the context of whether he would have altered his behavior had he been provided a label containing all of the information the plaintiffs claim is missing. Accordingly, the issue of causation must be submitted to a jury.

## Sophisticated User Defense

Finally, the defendant argues that it is entitled to summary judgment wherein it reasonably relied upon M&J Painting, a so-called "sophisticated user" of Sonothane, to convey the necessary warnings to the end-user. The plaintiffs counter that the sophisticated user defense is not recognized in Pennsylvania and even if it was, the facts of this case do not reveal M&J Painting to have been a sophisticated user.

In 1993, a panel of the Superior Court specifically adopted the sophisticated user doctrine for products liability and negligence actions, as set forth in section 388, comment *n* of the Restatement (Second) of Torts. *Phillips v. A.P. Green Refractories Co.,* 428 Pa. Super. 167, 630 A.2d 874 (1993) (one judge concurring and dissenting). Under that section: "a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects." *Id.* at 182, 630 A.2d at 882.

"Under section 388, the supplier remains under a duty to warn end-users, but can rely on a knowledgeable

employer to convey warnings. In this situation, the supplier is not delegating its duty, and it still can be found liable for end-users' injuries if its reliance upon the employer was unreasonable under the circumstances." *Id.* at 184, 630 A.2d at 883.

In *Phillips,* an employee in the steel industry who had developed silicosis, brought a product liability/failure-to-warn action against, among others, a supplier of silica sand. Two judges on the panel reversed a jury verdict in favor of the plaintiff holding that as a matter of law, the product was not unreasonably dangerous and also that, under the sophisticated user defense, the suppliers reasonably relied upon plaintiff's employer, U.S. Steel, to communicate the dangers of prolonged exposure of silica dust to its employees, which dangers had been known by U.S. Steel and generally within the industry for decades.[1]

On appeal, the Pennsylvania Supreme Court affirmed the holding of the Superior Court but on a different legal ground; that as a matter of law, plaintiff could not prove that supplier's failure to warn caused his injuries. *Phillips v. A-Best Products Co., supra* at 132, 665 A.2d at 1171. The court noted that the Superior Court's raising of the sophisticated user defense was dicta. *Id.* at 130 n.3, 665 A.2d at 1170 n.3. With regard to the sophisticated user defense, the court noted:

"Finally, we emphasize that this opinion does not speak to the doctrine that the duty to warn is non-

---

1. In the dissenting and concurring opinion one judge held that application of the sophisticated user defense was dicta since the court had already held that the product could not be considered unreasonably dangerous. *Phillips v. A.P. Green Refractories Co., supra* at 186, 630 A.2d at 884. In addition, the judge stated that even were application of the defense warranted, under the facts of the case the supplier failed to prove the defense should apply. *Id.*

delegable. See *Walton,* 530 Pa. at 577, 610 A.2d at 459. Whether [the supplier] breached its duty to warn would be relevant to determining whether [the supplier's] product was defective absent a warning, an issue which is not addressed by this court. Thus, this opinion does not abrogate or in any manner modify the non-delegability doctrine enunciated in *Walton.*" *Id.* at 133 n.7, 665 A.2d at 1171 n.7.

The non-delegability doctrine sets forth as follows:

"Where warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form that will reach the ultimate [user] and inform of the risks and inherent limits of the product. *The duty to provide a non-defective product is non-delegable.*" *Walton v. Avco Corp.,* 530 Pa. 568, 576-77, 610 A.2d 454, 459 (1992) (quoting *Berkebile v. Brantly Helicopter Corp., supra* at 100, 337 A.2d at 903). (emphasis added)

Accordingly, the question of whether the sophisticated user defense is viable under Pennsylvania law is unclear and for that reason, defendant is not entitled to judgment as a matter of law. See *Alexander v. Morning Pride Manufacturing Inc.,* 913 F. Supp. 362, 371-72 (E.D. Pa.1995) (following Pennsylvania Supreme Court ruling in *Phillips,* the district court predicted that Pennsylvania Supreme Court would not adopt sophisticated user defense in a failure-to-warn product liability action). However, even were we to conclude the doctrine does apply in this case, it is clear that the defendant's duty to warn was not properly discharged upon M&J Painting. First, as set forth above, defendant has failed to show that as a matter of law, it provided sufficient warnings on the cans of Sonothane to adequately warn M&J Painting of the hazards of the product. Second, even assuming its labels were adequate to convey to M&J

Painting the hazards associated with the product, it was not reasonable for the defendant to rely upon M&J Painting to warn the ultimate users of the product (its employees) or those who might be exposed to its hazardous effects. The owners of M&J Painting had used Sonothane on only one occasion prior to the incident at issue. (M. Van Wagner N.T. 36.) Furthermore, defendant has not indicated what if any knowledge it had vis-à-vis M&J Painting's knowledge about its product.

Accordingly, we enter the following:

ORDER

And now, September 17, 1996, defendant ChemRex's motion for summary judgment is hereby denied.